```
 1                  UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3                   _____

 4
     CMS Mechanical Services, LLC, )
 5                                 )    No. CV 15-2040-PHX-NVW
                 Plaintiff,        )
 6                                 )
           vs.                     )    Phoenix, Arizona
 7                                 )    July 11, 2017
     PetSmart, Inc.,               )    1:49 p.m.
 8                                 )
                 Defendant.        )
 9   _____)


10


11         BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE

12         REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                   (Motion Hearing)

14

15

16

17

18

19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
```

```
1    APPEARANCES:

2    For the Plaintiff:

3            OSBORN MALEDON PA
             By:  Geoffrey MT Sturr, Esq.
4            By:  Hayleigh S. Crawford, Esq.
             P.O. Box 36379
5            Phoenix, Arizona 85067

6            ALLWEISS & ALLWEISS
             By:  Michael D. Allweiss, Esq.
7            913 31st Terrace NE
             St. Petersburg, Florida 33704
8
     For the Defendant:
9
             BRYAN CAVE LLP
10           By:  Meridyth M. Andresen, Esq.
             2 North Central Avenue
11           Suite 2200
             Phoenix, Arizona 85004
12

13

14

15                                                          01:49PM

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                  P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Case Number CV 15-2040, CMS

 3   Mechanical Services, LLC, versus PetsMart, before the Court for

 4   oral argument.

 5            Will counsel please announce.                        01:49PM

 6            MR. STURR:  Good afternoon, Your Honor.  Geoffrey

 7   Sturr on behalf of the plaintiff.  With me is Hayleigh Crawford

 8   from my firm, and Michael Allweiss is also with me, Your Honor.

 9            MS. ANDRESEN:  Meridyth Andresen on behalf of

10   PetsMart, Inc.                                                01:50PM

11            THE COURT:  Well, this all started with a disputed

12   early termination of the contract, right?

13            MR. STURR:  Yes, Your Honor.

14            THE COURT:  And there's a time limit to the contract,

15   and that's what we're fighting about.                         01:50PM

16            First I want to hear -- we'll discuss the defendant's

17   motion, which is -- I have too much paper here -- Motion to

18   Exclude Plaintiff's Untimely, et cetera, damage motion,

19   Document Number 137.  So Ms. Andresen, I guess that's your

20   motion.  Come up to the podium.  The microphone is better      01:51PM

21   there.

22            I will tell you all when we were here before, the

23   thought occurred to me as to why the defendant didn't just move

24   to exclude these new damages as not disclosed in a time

25   sufficient to meet the case schedule, and in the nature of it,  01:51PM
```

```
 1    it could not have been newly discovered.  But that was not the
 2    relief that was sought.  And so I tried to sort it out, and we
 3    have just charged into a swamp.
 4           I suppose, Ms. Andresen, your answer is, well, you had
 5    your assurances they would get you what you needed.  You went        01:52PM
 6    and hired Mr. Mroz?
 7           MS. ANDRESEN:  That's correct.
 8           THE COURT:  And you shouldn't be punished for your
 9    attempt to proceed in good faith to finish up what you had been
10    assured you would be given.  But it does cut against the relief     01:52PM
11    you seek that we have charged now for five months into this.
12           I have another thought on this, which is -- and this
13    is a macro observation.  This is totally defeated by case
14    schedule.  Everything just fell apart.  So one approach to this
15    is to -- two approaches.  One approach is, all right, accept        01:53PM
16    defeat.  Everything got blown up.  People had a lot of money
17    they were fighting over and three months near the end it all
18    changed so we are just starting all over with a whole new set
19    of discovery, attorney's fees and all of that.  It's one way to
20    come at it.                                                         01:53PM
21           Another way to come at it is, I guess, somewhat
22    similar to what your motion says, not quite the same, but let's
23    go back to the idea I'm putting on the table.  And the idea is
24    let's just go back to where we were when we were on track to
25    have all the money your clients enjoy spending on legal fees        01:53PM
```

| | |
|---|---|
| 1 | come to fruition with a schedule, the schedules are not |
| 2 | aspirational, without having to, if it's avoidable, without |
| 3 | having to make specific determinations of bad faith here and |
| 4 | there and whatnot; just saying, let's go back and ex post facto |
| 5 | retroactively honor that schedule as well as can be done. |

01:54PM

6        MS. ANDRESEN:  You are talking, Your Honor, about the

7  November scheduling order?

8        THE COURT:  Correct.

9        MS. ANDRESEN:  Okay.  And is that proceeding without

10  the lost profits?

01:54PM

11        THE COURT:  I'm just musing.

12        MS. ANDRESEN:  Oh.  Okay.  I will let you continue.

13  I'm sorry.

14        THE COURT:  And that would necessarily involve

15  something like what you are requesting.  On the one hand, maybe

16  one -- this has morphed, mushroom clouded into something far

17  different than what it started out to and what we were close to

18  having ready for motions and trial.  And so it would mean

19  having to exclude the damage calculations that could not have

20  been a secret to the plaintiff from day one.  They just didn't

21  put it on the table.

22        MS. ANDRESEN:  Correct.

23        THE COURT:  Until a few months before the close of

24  discovery.  And if we went back and said, all right, what would

25  have been needed to be done to finish this up and we would do

01:55PM

```
 1    that, here we are six months later, rather than rewarding what
 2    with hindsight -- and I suppose you didn't see it this way --
 3    but with hindsight has turned out to be an opening of new doors
 4    that keep opening to another door, to another door, to another
 5    door of damages theory every expanding.                         01:56PM
 6          So, I mean, I guess -- I know I'm fond of saying
 7    lawyers are trained to be paranoid because you have to worry
 8    about things, but that would be excessive paranoia to have
 9    thought that was going to happen.
10          So I put it on the table.  That sort of would be a        01:56PM
11    move somewhere in the direction that you are asking but not
12    exactly the same reasons you were moving for, I mean, not to
13    exclude any of your reasons.  But the alternative is, as I just
14    said, start over.  We've got a new lawsuit.  We've got new
15    damages.  And I do recall from going through the discovery       01:57PM
16    dispute the last time that there was clearly a lot of discovery
17    that was needed.
18          You know, I have actually tried jury trials, lost
19    profits damages, and this dispute looks to me like an embryonic
20    version of the massive expert witness motions I get at the back  01:57PM
21    end about experts who are not allowed to testify because
22    there's just wishful thinking and advocacy, but, you know,
23    maybe they are allowed to testify if you don't -- lost profits
24    is not a mechanical process but it has to have reasonable
25    basis.  So anyway, I digress because I'm just -- I'm seeing all  01:58PM
```

```
 1    that tens if not hundreds of thousands of dollars of legal fees
 2    into the future.
 3             Well, I'm musing to let you all think about what
 4    I'm -- to alert you to what my large concerns are.  And
 5    depending on how we go, we're not going home until we have this
 6    discovery stuff worked out.  You all can't do it, you want to
 7    dump all of this on me where I am far less able to do it
 8    sensibly than you are, you are going to sit through my
 9    suffering and educate me on everything I have to decide.  And
10    we're not going home until it's done.  We'll come back
11    tomorrow.  I am leaving town on Saturday, but I'm available
12    until then.  We're going to get that done if it comes to it or
13    something.
14             So anyway, with that preface, I guess the main event
15    for you, Ms. Andresen, is two events, is how bad was it that
16    this was disclosed late; and did your vigorous pursuit of
17    discovery on it, including seeking and obtaining relief,
18    somehow make it -- I don't like these words about waiver of
19    estoppel because the law has a way of using words and
20    attributing phony meanings to them and we are all supposed to
21    know the phony meanings when we use the words.  But a broader
22    way to describe it would be that as the course of action the
23    defendants pursued on this, retaining an expert, seeking
24    discovery, not getting a lot you are entitled to, does that
25    somehow commit you in a basic fairness way to playing out the
```

1    hand that you drew instead of going back and saying, let's just

2    trash this whole game.  This game shouldn't have gone forward

3    at all, and we were just being nice guys when we thought they

4    told us they could get us everything we need, and here we are.

5            So I have had an enormous amount of work lately and I          02:00PM

6    have done the work that's more worthy of my time.  So it's your

7    motion, Ms. Andresen.

8            MS. ANDRESEN:  Okay.  Thank you, Your Honor.

9            I didn't prepare a traditional PowerPoint, but I do

10   have a printout of slides, if you don't mind if I approach to          02:00PM

11   hand this to you.

12           THE COURT:  You may.

13           MS. ANDRESEN:  I'd like to start with the basics.

14   There was some confusion in the motion, and I will accept

15   responsibility for some of that, about exactly what was the            02:01PM

16   basis for our motion to strike.  And, Your Honor, you focused

17   in a little bit on that in your opening comments.

18           The motion is based solely on the failure to disclose

19   under Rule 26(a) and (e), not on the failure to comply with the

20   Court's order on the Motion to Compel, though we do have issues        02:01PM

21   with that and we believe there has been non-compliance.  The

22   purpose of referring to that non-compliance has been only to

23   demonstrate to the Court how the lack of a disclosure has

24   really affected and harmed PetsMart and its ability to prepare

25   its rebuttal to the damages claim and prepare for trial.               02:02PM

1        So in the motion we were not asking for a disclosure,

2   instead we were asking and trying to make the point that it is

3   simply too late for CMS to change its damages calculation again

4   or try to supplement the record with information that might

5   support its claim after we have identified all of the              02:02PM

6   deficiencies with its damages through our deposition and

7   through our expert report.

8        So the request is simple:  Rule 26(a) says that a

9   party must disclose this information without waiting a

10  discovery request, a computation of the damages, and the          02:02PM

11  evidence supporting that.  The purpose of that rule is to give

12  the other party an opportunity to organize and prioritize its

13  discovery; to promote fair and cost-effective discovery; put

14  PetsMart, for example, on notice of the claims that it is

15  facing and give it a reasonable opportunity to prepare for        02:03PM

16  trial.

17        In the *Smith versus Walmart Stores* case that we cited

18  in our motion at 13, the Court cautioned and said that Rule

19  26(e) which allows supplements does not create a loophole for

20  parties who wish to revise their initial disclosures to its       02:03PM

21  advantage after the deadline has passed.  And it does not allow

22  them to add information to the record.  It's really meant to

23  correct based on information that is made available to them

24  after the initial disclosures.

25        And as the Court pointed out in your opening comments,      02:03PM

1   nothing that has been disclosed at any point in this litigation

2   relating to lost revenues or lost profits was information that

3   was not solely within CMS's possession since the inception of

4   the litigation.

5       If you turn to Page 5 of this PowerPoint, I just cite   02:04PM

6   again to the Court's standing order that's in all of the

7   scheduling orders that makes clear that the discovery deadlines

8   in this case are real and that there are real penalties that

9   will be imposed if the parties fail to meet those deadlines.

10      THE COURT:  I actually say that twice in my order.   02:04PM

11  Nobody believes anything you say just once.  So go ahead.

12      MS. ANDRESEN:  Thank you.  I appreciate that.

13      And including dismissal of the action in its entirety

14  or an entry of default if those deadlines are not complied

15  with.  PetsMart complied with all such deadlines.  CMS did not.   02:04PM

16      If you turn the Page 6, in CMS's initial Disclosure

17  Statement in December of 2015 it indicated that it was going to

18  seek lost profits and it would later disclose in a supplemental

19  Disclosure Statement the basis of those damages in the

20  calculation.  CMS never ever supplemented that disclosure and   02:05PM

21  ever put in a Rule 26 disclosure that evidence, that

22  calculation of that evidence except until last Thursday.  And

23  on last Thursday, within 10 minutes of the Court issuing its

24  order, we received a 23-page Disclosure Statement on lost

25  profits and this stack of Excel spreadsheets that support those   02:05PM

1    calculations.  And I will say to the Court that this is a

2    condensed version of the documents.  They were reduced by 40 to

3    50 percent from the size they appeared in the Excel file so

4    that we could actually fit them in a box to bring them here.

5          THE COURT:  You know, I won a big motion once by          02:06PM

6    bringing in front of the judge a handcart full of documents and

7    it scared him and he ruled for me.  The Court of Appeals

8    reversed it.

9          MS. ANDRESEN:  Hopefully I have the same effect but

10   with a better appellate position.                               02:06PM

11         That disclosure was seven months after the December

12   29th disclosure deadline.  That disclosure came after PetsMart

13   deposed CMS's president, took a 30(b)(6) deposition, and issued

14   its initial expert report.

15         THE COURT:  Let me just stop you for a minute.            02:06PM

16   Remember exactly where you are.  I want you to go back there.

17   I want to go back and make sure I have my feet on the ground

18   here.

19         Walk me through again the difference between the

20   initial damage disclosure and these new chances as they began   02:06PM

21   to evolve.  I thought it was just they had a contract.  What

22   was their initial measure of damages they disclosed?

23         MS. ANDRESEN:  Their initial measure of damages was

24   that they were seeking what we referred to as deferred billing.

25   So that is -- the PetsMart contract was a five-year contract,   02:07PM

1    so 60 months.  It continued for 26 months.  And it was paid at

2    a certain rate.  When it was terminated, CMS said that that

3    lower rate was only applied to that contract with the promise

4    that the contract would continue for five years.  And when

5    PetsMart terminated the contract early pursuant to the        02:07PM

6    termination for convenience provision, it now owed the

7    difference for the first 26 months of that contract to pay the

8    higher rate and not the discounted rate that it was being

9    offered.

10           THE COURT:  Was that for the first 24 months, or how   02:07PM

11   did that project into the remaining term of the contract

12   assuming it was wrongfully terminated?

13           MS. ANDRESEN:  That was for the first 26 months of the

14   contract when the contract was performed, and for the remaining

15   34 months they put a placeholder for lost profits.  And        02:08PM

16   importantly, the Court addressed this on January 21st, 2016 in

17   the Rule 16 conference specifically.  And you asked directly to

18   Mr. Sturr, "When do you think you have to fish or cut bait on

19   your lost profits theory?  Do you think you can do that at the

20   close of evidence?"                                            02:08PM

21           In response, Mr. Sturr said, "Well, I think, Your

22   Honor, perhaps before then.  Under Rule 26 we have to make

23   disclosures.  And at this point, we have just put a placeholder

24   in our initial Disclosure Statement for anything other than

25   contractual damages."                                          02:08PM

1          THE COURT:  Well, I mean, I just want to make sure

2     that I'm not losing my footing here.  Contractual damages

3     covers everything, so be more specific.  I understand the claim

4     of this is coming back because I remember I thought that's an

5     unusual -- not that there's anything wrong with it but I have          02:09PM

6     never seen a case with that kind of approach to damages that he

7     had the discounted rate and since you terminated we get the

8     normal rate.  I understand that.  And that was for 26 months,

9     so it's 34 months.  Why couldn't it have -- well, all right.

10    I'm not going to --                                                    02:09PM

11          MS. ANDRESEN:  So my understanding was it was for 26

12    months, and at that time they were saying that was $2.5 million

13    in damages.  That was the differences between the discounted

14    rate and what they believed was the contracted rate that should

15    have been paid for the first 26 months.  They had a placeholder       02:09PM

16    for lost profits for the remaining 34 months.  Then there was

17    this exchange at the Rule 16 conference.

18          And, Your Honor, you said that you were getting to the

19    lost profits aspect of the damages, and you essentially said

20    that's very difficult to prove.  You should think about whether       02:10PM

21    you want to pursue it.  And Mr. Sturr said, "I think it's

22    unlikely that we're going to pursue that, but I don't want to

23    say that definitively."

24          THE COURT:  They weren't going to walk away from the

25    last 34 months.                                                       02:10PM

1          MS. ANDRESEN:  I'm sorry?

2          THE COURT:  They were not going to walk away from the

3     last 34 months assuming it was a wrongful termination, correct?

4          MS. ANDRESEN:  They were in the beginning, yes, that

5     was the lost profits that they were going to try to determine          02:10PM

6     if they were going to proceed or if they were just going to

7     seek the 2.5 million.

8          THE COURT:  Of course -- well, all right.  Please

9     continue.

10          MS. ANDRESEN:  And, in fact, the exchange, in that          02:10PM

11     exchange, the Court specifically said, "$2.5 million is a lot

12     of money.  You still have a lot of damages, and lost profits

13     very difficult to prove.  It's going to increase your fees and

14     be messy."  And that is when they said they intended to

15     disclose that early in the process.          02:10PM

16          Then six months after that Rule 16 conference they

17     amended their complaint and removed the lost profits claim

18     altogether.  So everyone was proceeding under the $2.5 million

19     deferred billing damages.  Then in September they amended their

20     Disclosure Statement and increased the deferred billing damages          02:11PM

21     from roughly 2.5 or 2.6 to $3.5 million in damages.  They said

22     it was a deeper discount.  They had miscalculated what was

23     owed.

24          THE COURT:  Miscalculated what would have been the

25     rate or whatever but for the five-year commitment?          02:11PM

1    MS. ANDRESEN:  Correct, what would have been the

2    contract rate versus what was paid under the contract for 26

3    months.  So they increased that roughly a million dollars.  And

4    that is when they also disclosed that they were going to seek

5    lost revenues.  And for that, they disclosed in the Disclosure          02:11PM

6    Statement here's what the monthly capped fee was.  We're

7    multiplying that by 34 months.  This gives us $20 million in

8    lost revenue.

9         THE COURT:  Tell me what the monthly capped fee was.

10        MS. ANDRESEN:  There's a dispute over what that should     02:12PM

11   be.

12        THE COURT:  I'm not asking you for the number.  I'm

13   asking you for the theory of it.

14        MS. ANDRESEN:  Okay.  So there was, under the

15   contract, the Statement of Work attached to it, there was a            02:12PM

16   listing of all the PetsMart stores.  And next to that listing

17   there was a price indicating what they were going to pay per

18   month for that store.  That was the price that PetsMart

19   believed it was going to pay, although it understood that may

20   adjust upward or downward when they got into the stores and           02:12PM

21   started performing site surveys.  And if that occurred,

22   PetsMart thought they would then come back together and, in

23   writing, amend the contract if the price needed to be adjusted.

24        CMS says their position is that in their contract

25   there was a formula.  And the formula in the contract said it         02:12PM

would apply to all additional stores that were added because

PetsMart was growing and adding new stores.  Their position is

that when the contract terminated that that formula applied to

all the stores, including the stores that were listed with a

price next to them in the attachment to the contract.  And then

there was an adjustment because there's a dispute on how that

calculation is actually applied to each store because you can

apply it two different ways and come up with two very different

prices.  So there's been quite a bit of movement on the

deferred damages amounts and how that should be calculated as

well.

So right when the contract was terminated, CMS sent a

demand letter to PetsMart and said, here is what you owe us,

and here's the calculation of this deferred billing.  And that

was $2.5 million.  A couple years later they changed it and

said we calculated that wrong.  It's actually $3.5 million,

roughly.

So that is an issue of itself whether the deferred

billing was appropriately disclosed.  But with respect to the

lost profits, it appeared that they had made a placeholder.

They had promised to disclose the detail of that if they

intended to pursue it, and they never did.  Instead they

dropped the complaint, the allegation of lost profits

altogether last summer, approximately a year ago.

THE COURT:  What I'm trying to get a rough handle on

1    is this lost profits for the last, what, 24?

2             MS. ANDRESEN:  36 months.  34 months.  I'm sorry.

3             THE COURT:  34 months.  That's different from the 2.5,

4    3.5 million?

5             MS. ANDRESEN:  Correct.                                    02:14PM

6             THE COURT:  It covers a different time period of

7    damage, correct?

8             MS. ANDRESEN:  Correct.  The 2.5 million is those

9    months were all paid for.  The first 26 months PetsMart paid

10   for those months.  After they terminated the contract CMS says   02:14PM

11   we're now going to back bill you for this difference in the

12   amount from what we think the contract required and what you

13   were actually paying for those 26 months.  We think you owe us

14   the difference.

15            THE COURT:  Because of the wrongful termination?         02:14PM

16            MS. ANDRESEN:  That was their original position.  They

17   have changed that position now and said that at all times

18   PetsMart was going to be obligated to pay the full amount, but

19   it was going to be sometime at the end of the contract.  So

20   they were just deferring those billings not giving PetsMart a    02:15PM

21   discount for agreeing to a five-year term.

22            THE COURT:  I'd hate to be the lawyer who wrote that

23   contract if you have uncertainties of that magnitude.

24            MS. ANDRESEN:  There's going to be a lot of motions, I

25   fear, in front of you on contract interpretation and             02:15PM

1   modifications and meeting of the minds in your not so distant

2   future.

3              THE COURT:  All right.

4              MS. ANDRESEN:  So back to the lost profits.  So a year

5   ago, PetsMart is proceeding in the litigation thinking there is          02:15PM

6   no lost profits claim until September or October when the

7   Disclosure Statement was amended.  And again, that was amended

8   to reflect a lost revenue claim which PetsMart thought was

9   absolutely unsustainable that they would get 100 percent of the

10  contract fees revenue without performing any of the contract,           02:16PM

11  that it wouldn't be reduced by any avoided expenses.

12             THE COURT:  Doesn't sound like that could survive even

13  as a matter of law.

14             MS. ANDRESEN:  That was our position, and that was

15  what was disclosed.  They amended the complaint.  PetsMart             02:16PM

16  allowed them to amend the complaint, reserved all of its rights

17  to challenge legally the new theory but for efficiency sake

18  decided not to file a motion on that but said give us your

19  discovery.  So they immediately served discovery.  And

20  actually, if we turn to Page -- there's a little timeline with         02:16PM

21  very small print.  I apologize.  It did not fit well on Page

22  10.

23             So on October 21st, PetsMart served its written

24  discovery and CMS agreed to an expedited response time to try

25  and get the information to PetsMart sooner because we were            02:17PM

approaching that December 29th deadline.  They answered those

discovery on November 15th.  Interestingly enough, the last day

to serve any additional written discovery was the prior day,

November 14th.  So once PetsMart received those interrogatory

responses it no longer had the ability under the scheduling

order to serve any follow-up discovery, which is part of the

problem here.

        So CMS and PetsMart engaged in meet-and-confer going

back and forth.  I won't belabor that because most of that was

addressed in the Motion to Compel.  So they continue with that.

December 29 comes and goes, which was the deadline for all fact

discovery.  There was just a few exceptions for the expert

report and two lingering depositions that were excluded from

that.  And that was the deadline for the Rule 26(a)(3) final

pretrial disclosures.  PetsMart made its disclosures.  CMS made

no such disclosures.

        Thereafter the discussions continued because we had

approached the Court and had an ongoing dispute about the

discovery, and you allowed us to brief the issue.  And so while

we were discussing that, CMS started producing additional

documents, large volumes of documents, documents PetsMart did

not request.

        THE COURT:  Yes.  I recall that.  If that's what

happened, that's extremely troubling, just a data dump instead

of answers to interrogatories or discovery.  Anyway, go ahead.

1          MS. ANDRESEN:  On January 12th, PetsMart filed, well,

2     lodged under seal its Motion to Compel.  So that's the date it

3     was served on opposing counsel.  And on that very same day CMS

4     filed a supplemental interrogatory response, which we did not

5     ask for, and disclosed a whole new theory of its expenses.        02:18PM

6     Prior to that date we had been pushing them to find out what

7     their expenses were.  We said what are the expenses for

8     servicing a national account like PetsMart and they said labor,

9     material, and miscellaneous and refused to give us any more

10    information than that.                                            02:19PM

11         On that same date that we filed our Motion to Compel

12    and they supplemented their interrogatory.  They disclosed a

13    burdened labor rate, which they had never previously before

14    disclosed to PetsMart and said the labor rates we had

15    previously been using in our analysis, it's actually a burdened  02:19PM

16    labor rate that incorporates all these other variable expenses

17    from our statement.  And it identified some categories that did

18    not give any other underlying calculations.

19         THE COURT:  Back up.  That's made up -- what do you

20    mean by "burdened labor rate"?                                    02:19PM

21         MS. ANDRESEN:  The documents that we had received

22    would show a margin analysis on a particular work order and

23    would say, this is the value of 33.46, I think it is.  That's

24    the labor rate, and that would be multiplied by a certain

25    number of hours.  We were assuming that was the actual rate of   02:20PM

1    pay for the employee performing it.  They just called it labor.

2    That's all we knew.

3         So on January 12th when they disclosed a burdened

4    labor rate, they said no, that's not the rate of pay.  That is

5    actually the rate of pay plus a percentage of these overhead      02:20PM

6    expenses that are variable.

7         THE COURT:  All the company's overhead?

8         MS. ANDRESEN:  Yes.  And they attributed certain

9    categories to that.  But we didn't understand how they did

10   that.  We just knew that they were telling us this burdened      02:20PM

11   labor rate included those things.  And again, that's the day we

12   filed our Motion to Compel.  So at this point we have no

13   ability to take any further discovery on that other than to ask

14   some questions during the deposition that happened a little bit

15   after.  And in that deposition, it was suggested to us that      02:20PM

16   there is a document that calculated this, some kind of a

17   schedule that CMS had calculating that labor rate.  And we did

18   ask for that in our Motion to Compel.  We adjusted our Motion

19   to Compel to ask for that, although when we asked for it in the

20   Motion to Compel, we had not yet taken the deposition so we      02:21PM

21   weren't sure what it was called.  But we wanted no know what it

22   was they were relying upon for this rate that they had

23   disclosed.

24        Then they continued to produce another 130,000 pages

25   of documents.                                                    02:21PM

1      THE COURT:  Before we get to that, this is just a

2  heads up for Mr. Sturr, my recollection is these lost profits

3  are because you are dealing with marginal costs.  32 years ago

4  I tried a six-week jury trial on lost profits and it's all

5  marginal cost.  You don't get to grab in overhead that you          02:21PM

6  otherwise have.  So that's for Mr. Sturr to satisfy my

7  curiosity.  But go ahead.

8      MS. ANDRESEN:  That is an analysis that Mr. Mroz was

9  conducting.  But at that time we had roughly just some work

10  orders and we had their financial statement.  So he was trying   02:21PM

11  to do the analysis with the minimal amount of information we

12  had preparing for his upcoming expert report and the

13  depositions.  And then each time new information was given, we

14  would have to evaluate that, see if there was any use to it.

15  As I said, most of that was information we did not request, and   02:22PM

16  trying to continually adjust our preparations.

17      Then in early February, because the motion was

18  completely briefed at this point and it was pending before the

19  Court, we asked CMS on two different times if we could move the

20  depositions and move the expert report deadline to see how the   02:22PM

21  Court ruled on the motion.  Because we knew if it was granted

22  there was going to be a significant amount of information that

23  would come that would be helpful in those two endeavors, and

24  they refused both requests.  So we felt we had no option but to

25  go forward with the deposition and to have Mr. Mroz issue his    02:22PM

1    expert report, which we did.

2         After both of those were completed, we received the

3    Court's order.  And at that point we quickly tried to get a new

4    schedule before the Court.  We were unable to agree with CMS on

5    exactly what would be warranted, but in the few days we had          02:23PM

6    before we had to submit something to the Court it was clear

7    that there was going to be some disagreement about what we

8    thought we wanted and what CMS wanted to produce to us.

9         I think the reading of the Court's order may have

10   suggested to CMS that you had concerns about their disclosures      02:23PM

11   to date and the information they had provided, and they saw

12   that order as an opportunity to start filling the record with

13   information to support their claims; otherwise they may be

14   stricken.  And we wanted to resist that.  We wanted only the

15   documents that we had requested.  And again, the landscape had      02:23PM

16   changed somewhat because after we filed the motion we took

17   those depositions and we issued our expert initial report.

18        After that, CMS continued to supplement on the

19   deadline that they had proposed in the Court order.  They

20   produced all of the things that they had proposed, many of          02:24PM

21   which were not requested by PetsMart, many of which we still

22   don't understand why we received.  And then, of course, last

23   week we get this stack of documents and a brand new disclosure

24   disclosing yet again a new damages calculations on the lost

25   profits.                                                            02:24PM

1        That disclosure specifically says it's addressing

2    points that were made in our deposition where we identified

3    deficiency in the information.  They had been telling us that

4    these giant Excel spreadsheets were taken essentially cut and

5    paste directly from their underlying accounting system, and we          02:24PM

6    were finding errors in there.  So now they have corrected the

7    documents.  We thought that drew some questions as to the

8    reliability of the data, and it was further evidence as to why

9    we didn't think they could support their lost profits with any

10   reasonable certainty as would be required.                              02:25PM

11       And Mr. Mroz's expert report also identified several

12   problems with their damages, and lo and behold, they also

13   supplemented their interrogatory response on this burdened

14   labor rate which he, if you turn to -- let's see.  Page 16,

15   here's an excerpt from Mr. Mroz's expert report where he says          02:25PM

16   that plaintiff did not provide any calculation detail or

17   support documentation to show how it derived the burdened labor

18   rate used in the claim nor any support documentation for the

19   accuracy and completeness of these rates.

20       On the May 1st disclosure following the Court's order             02:25PM

21   on the Motion to Compel, they supplemented an interrogatory

22   that we had not moved on.  It was not included with what we had

23   requested.  We asked for the burdened labor rate schedule,

24   meaning the documents Mr. Bull talked about in his deposition

25   he said he created in 2001 in the deposition.  Instead, they          02:26PM

1    supplemented the interrogatory, provided much more detail,

2    essentially went directly to what Mr. Mroz had said in his

3    report were deficiencies and tried to correct them.  And not

4    only did they do that but they also offered another alternative

5    burdened labor rate calculation method.                          02:26PM

6            Essentially, it seems as though our win on the Motion

7    to Compel has been used as opening the door for CMS to change

8    its theory.  And as the Court indicated, lots of money has been

9    spent through our expert, through our attorney time, trying to

10   get these documents, trying to get our heads wrapped around it,  02:26PM

11   trying to move this case forward and aim at what has become a

12   shifting theory and a moving target.  And it has continued to

13   cause prejudice.

14           THE COURT:  All of it after my schedule had expired.

15           MS. ANDRESEN:  Correct.                                   02:27PM

16           THE COURT:  Please continue.

17           MS. ANDRESEN:  Under the rules, under Rule 37, I think

18   there can be no dispute.  And I think the fact that CMS

19   supplemented -- didn't supplement, I'm sorry -- issued its

20   first Rule 26 Disclosure Statement on the lost profits          02:27PM

21   calculations with that backup data last week is an admission

22   that they did not comply with the Court's order.  And they

23   issued that without talking to PetsMart.  I saw no movement

24   with the Court asking for permission to file that late.

25           So that's a clear violation of Rule 37(c).  And under    02:27PM

the rules, if you look at Page 11, the cases call that an

automatic self-executing sanction.  It means that the

information that was not timely disclosed must be disclosed

from a trial, from a motion, or a hearing.

THE COURT:  I think I have to make a ruling to exclude `02:27PM`

it.  So I don't think you can show up at a trial and say, oh,

that was automatically excluded.  Anyway, please continue.

MS. ANDRESEN:  Yeah.  Sorry.  I agree.

The only way to save that belated disclosure was to

show that it was substantially justified or harmless.  And the `02:28PM`

cases that look at this issue focus on when did the party that

failed to disclose it in a timely fashion, when did they know

about that information?  Was it in the hands of the other party

and it was, you know, put into their hands late in the game and

that's why it took so long for them to disclose it?  We know `02:28PM`

that's not the case here that's all of their financial

information.  And we also know that they identified lost

profits at the very beginning of this case, and they chose

later to remove that from their complaint and decide not to

seek lost profits.  So they can't say this is an idea they came `02:28PM`

up with late in the game, either.

Because they have not shown substantial justification,

and they have not shown that it's harmless, we believe that the

Rule 37(c) sanction to exclude their lost profits evidence and

calculations is required under the rules.  And even though `02:29PM`

1    PetsMart is not -- the burden is on CMS to prove that it was

2    harmless or to prove that it was substantially justified.  And

3    even though it's not PetsMart's burden, there is a lot of

4    evidence before this Court in our motions showing that there

5    was harm to PetsMart.                                           02:29PM

6          THE COURT:  Harm seems obvious.  But go ahead.

7          MS. ANDRESEN:  And I agree.  And the harm is

8    multi-fold.  The money and the time and expenses wasted as we

9    keep readjusting and re-evaluating the new theories as they

10   come forward; the inability to conduct complete and follow-up   02:29PM

11   discovery on that initial lost profits interrogatory answer and

12   then also having our theories and our analysis exposed and the

13   opportunity for CMS to respond to it in a way that betters

14   their position and weakens ours after the close of discovery

15   and prohibiting us from having a closed record on which we were  02:30PM

16   moving on our expert analysis.

17         We believe that the Court's May 22nd order

18   specifically warned CMS not to put new information into the

19   record, that it did not believe it would be appropriate for CMS

20   to use your order compelling discovery as an opportunity to     02:30PM

21   inject new information into the record.  But despite that fact

22   if you turn to Page 15, there's a list in this PowerPoint of

23   documents and information that was provided that we did not

24   specifically request.  And then, of course, there is a list of

25   things that we did request that have not yet been provided.     02:30PM

1          For those reasons, we think there's no justification.

2     We think the harm is evident, and we believe that the lost

3     profits calculations and the supporting evidence should be

4     stricken.

5          THE COURT:  Let me walk through the mechanics of this.     02:31PM

6          How is that different, or is it different, from what I

7     just hypothesized at the beginning of we just wind back the

8     clock, wrap this case up the way it was as properly disclosed?

9     Maybe it is no different.

10          MS. ANDRESEN:  I don't think it is any different.     02:31PM

11          THE COURT:  Maybe more discovery.  If there was some

12     discovery that could have been done that would have been done

13     that would be unfair to let it go unfinished then I would allow

14     that.  But is that any different from what you are asking for?

15     I'm not sure.     02:31PM

16          MS. ANDRESEN:  No.  No, it is not.  It would

17     essentially be to wind the clock back to the last appropriately

18     disclosed damages, which I believe would be just the deferred

19     billing of the $3.5 million revised calculation.

20          THE COURT:  All right.     02:32PM

21          Ms. ANDRESEN:  Unless the Court has any further

22     questions.

23          THE COURT:  All right.  No.  I will hear from whoever.

24          MR. STURR:  Good afternoon, Your Honor.  Geoffrey

25     Sturr on behalf of the plaintiff.     02:32PM

1      Thank you for your musings.  I see I have some tough

2  sledding ahead of me.  The good news, Your Honor, is --

3      THE COURT:  Well, let me just supplement my musing.

4  I'm trying to think through a practical way out of this swamp

5  that's fundamentally fair.  Anyway, go ahead.                    02:32PM

6      MR. STURR:  I'm going to do my best, Your Honor, to

7  re-create the image of the swamp that we think is not entirely

8  accurate.  We don't think it's a swamp.

9      THE COURT:  I feel very much in the middle of a swamp.

10     MR. STURR:  Well, the good news, Your Honor, I just          02:32PM

11  want to highlight this point.  On the second point you issued

12  the lack of time you have in the discovery issues, we have met

13  and conferred.  We have made substantial progress.  We have a

14  document to share with you that we can walk through efficiently

15  that I think will close out those issues when we get to that    02:33PM

16  point.  So I don't expect to be with you tomorrow.

17     Your Honor, let me go back to a point you made in your

18  musings that you thought that this was a lost profits claim

19  that was no secret that could have been pursued from the

20  outset.  And I want to correct what Ms. Andresen said about the  02:33PM

21  early stages of the case.  She was not here.  That the original

22  theory of the case in the original complaint sought damages

23  solely for what we call deferred billings.  These were payments

24  that should have been paid before termination that were not

25  paid.                                                           02:34PM

1          THE COURT:  I have got to be sure I'm clear on that.

2     I thought they got paid monthly, whatever the contract said.

3          MR. STURR:  They were paid monthly.  There was an --

4     we alleged in the complaint there was an agreement to reduce

5     the monthly payments to help PetsMart meet its budget                    02:34PM

6     requirements.  And we said, in reliance on that, we believed

7     this was a five-year contract and the that we were entitled to

8     the difference between the deferred billings that we received

9     and the full amount we could have charged.  That was the

10    original theory of the case.  And that was a breach of contract       02:34PM

11    claim that only addressed the damages that were not -- excuse

12    me -- billings that were not fully paid on the date of

13    termination.

14         THE COURT:  Okay.  Let me, again, I want to explore

15    that a little bit.  This is coming back to me.  But --                  02:34PM

16         MR. STURR:  I will get to your question --

17         THE COURT:  Hold on.  I want to get that foundation,

18    make sure I'm clear in my mind.  They had a contract that paid

19    a certain amount, and did it say straight out this is a

20    five-year contract, or is that a matter of inference?  You had      02:35PM

21    a contract with a monthly rate, right?

22         MR. STURR:  We had a contract for which we were

23    allowed to bill certain amounts for services, so it fluctuated

24    based on the services performed.

25         THE COURT:  Right.                                                02:35PM

1          MR. STURR:  The client came to us and said, I can't

2    meet my budget.  So we said, okay.  In exchange for making this

3    a five-year contract, we will reduce those billings to a flat

4    amount.  So we billed that for a period of time.  The contract

5    gets terminated, and we say, the contract says you can't                02:35PM

6    terminate unless you have paid for all services.  Well, if you

7    back up and say we didn't bill you for the full amount, we are

8    entitled to the delta, that was the damage claim.  It was for

9    the full amount we were entitled to receive but did not receive

10   because of this oral agreement.  So that was --                         02:36PM

11          THE COURT:  Oral agreement?

12          MR. STURR:  Oral agreement with PetsMart to modify the

13   contract to allow for these payments.

14          THE COURT:  I'm sorry.  Was the five-year term an oral

15   term?                                                                    02:36PM

16          MR. STURR:  We allege that we had detrimentally relied

17   on the promise that the contract would extend five years.

18          THE COURT:  The answer is was the five-year term an

19   oral term?

20          MR. STURR:  No.  It's written in the contract.               02:36PM

21          THE COURT:  Whatever she says is right.

22          MR. STURR:  My point, Your Honor, is that was the

23   theory of the case.  We were not seeking future lost profits,

24   as Ms. Andresen said.  In fact, if you look at the complaint,

25   all we said was -- and this was that you challenged us at the       02:36PM

1    initial Rule 16 conference -- was we alleged in the complaint

2    that we were entitled to recover either our damages or profit.

3    And you said how are you going to do that?  We had a discussion

4    about which is it?  It was an election of remedies.  And we

5    agreed with you.                                          02:37PM

6            Remember also Mr. Akbar was here, Your Honor, and

7    PetsMart's position at the time was they were -- they had

8    justifiably terminated the contract.  They asserted a

9    counterclaim to say, you had poorly performed services.  So

10   when we brought the case to you, we were only seeking damages  02:37PM

11   for the unpaid amounts.  We did not think based on the contract

12   that we had a basis for pursuing a separate lost profits claim.

13           THE COURT:  Hold on.  I have to -- I have not

14   assimilated your tailor-made vocabulary yet for this case.

15   What word do you want to use to identify the additional         02:37PM

16   increments of what you say you should have gotten and they

17   impliedly agreed to if you terminated as opposed to the term

18   that had a lower rate --

19           MR. STURR:  We referred to that as deferred billing.

20           THE COURT:  Deferred billing.                        02:38PM

21           MR. STURR:  Deferred billing.  Okay.  And we initially

22   targeted that number at two and-a-half million.  We amended the

23   disclosure to say we didn't calculate it properly.  It's

24   actually 3.4 million.  But the term you see is deferred

25   billing.                                                     02:38PM

1          THE COURT:  What would that be if that were a

2     terminable at will contract?  Those would be the rates that

3     would be paid?

4          MR. STURR:  That's what makes the case interesting,

5     Your Honor.                                                    02:38PM

6          THE COURT:  There's a whole lot of interesting stuff.

7          MR. STURR:  This is an unusual contract.  It's a

8     commercial contract, but it has a termination for convenience

9     provision.  And I don't know if you did any government

10    contracting work.  Termination for convenience is a term of art   02:38PM

11    in the government contracting world.  You rarely ever see it in

12    a commercial contract.  When we took on the case, we looked at

13    it.  We didn't know why PetsMart terminated the contract.  We

14    saw from the counterclaim that their theory was we had been

15    poor performers as evidenced by the counterclaim.  So when we    02:38PM

16    were here with Mr. Akbar, we were not talking about lost

17    profits for future revenue.  We were saying for that past

18    billing, deferred billing, and you sensibly said, come on.  You

19    are either going to get the benefit of the bargain or you are

20    not going to try to prove lost profits from that.  We said, you   02:39PM

21    are right.  So we dropped it.

22          Now, you also said to Mr. Akbar, what's your proof?

23    Are you going to get expert testimony about our poor

24    performance?  PetsMart decided they couldn't prove the case, so

25    they dropped their counterclaim.  We then took two key          02:39PM

1    depositions.  And this goes back to your point, Your Honor,

2    that how on earth could we not have disclosed this.  We didn't

3    know until we received their discovery, we analyzed their

4    internal communications about the contract, we received the

5    grounds for termination.  We learned they hired a consulting          02:39PM

6    firm to come in and say, hey, you can make money by canning

7    this company.

8          THE COURT:  You can get a better price with somebody

9    else.

10          MR. STURR:  If you get a better price.  We then took          02:39PM

11    these depositions two key witnesses; the person who negotiated

12    the contract and the person who decided to terminate it.  They

13    said unequivocally, no question with performance.  Great work.

14    Not an issue.  We're only doing it to get a better price.

15          Now, going back to the government contracting model          02:40PM

16    and this rare concept of a termination for convenience, we have

17    researched the issue under various states.  Courts have looked

18    at these contracts and said, you cannot terminate for

19    convenience and say I have the unilateral right to terminate a

20    contract.  It's governed by the Covenant of Good Faith and Fair          02:40PM

21    Dealing.  So you can't just cancel the contract to get a better

22    price.

23          THE COURT:  What kind of words can you put that label

24    on?  Label is termination.  What does it actually say?

25          MR. STURR:  The language --          02:40PM

1          THE COURT:  You don't have to read it to me.

2          MR. STURR:  It says termination -- in government

3     contracts you see it all the time and there's a whole body of

4     case law that says you can terminate for any reason.  But what

5     it says is they have the right to terminate for -- any party          02:40PM

6     may terminate this agreement or any sale for convenience upon

7     30 days notice.  So what does that mean?  Our belief --

8          THE COURT:  It sounds like a contract terminable at

9     will by either side.

10         MR. STURR:  Our belief, Your Honor, and you may          02:41PM

11    disagree.

12         THE COURT:  I'm just talking.

13         MR. STURR:  The case law says you incorporate the

14    Covenant of Good Faith and Fair Dealing and it doesn't give

15    somebody a right to cancel the contract for no reason at all.          02:41PM

16    Now, you may ultimately disagree with this.  This is why,

17    Judge, you say why didn't you assert this earlier?  We couldn't

18    have made that claim in good faith until we took that

19    discovery.  And we concluded that discovery in September, I

20    believe, of last year.          02:41PM

21         THE COURT:  You have got to walk me back because that

22    goes to whether you have a breach of contract at all.  What

23    does it have to do with not being able to figure out or at

24    least assert a theory of damages?

25         MR. STURR:  Well, we didn't know we had the evidence          02:42PM

```
1    to argue that the termination had been in bad faith.

2    Essentially we were saying they do not have the unilateral

3    right to terminate.

4             THE COURT:  That's liability.  That's not damages.

5             MR. STURR:  We needed the evidence to even make the      02:42PM

6    argument.  Particularly when they came in with a counterclaim

7    saying poor performance, we had found out they had no reason

8    for terminating except to get a better price.  That's how we

9    got here.

10            THE COURT:  I understand that.  But I'm lost as to how    02:42PM

11   that has to do with your inability to say, hey, we're going to

12   go for lost profits.  You found out that their defense -- well,

13   it's complicated.  But that makes no sense to me how that

14   prohibited you from deciding on day one, we've got a breach of

15   contract.  We've had some historic time.  We've got this theory  02:42PM

16   how we can back charge.  We've got some future time on it.

17   That's lost profits.  That's not rocket science.

18            MR. STURR:  Well, I'm not as smart a lawyer as you,

19   Your Honor.  I'm telling you the truth about how we got to this

20   point, okay.  We did not believe we could have asserted that     02:43PM

21   claim until we had that discovery.

22            THE COURT:  I don't find that to be persuasive, not --

23   it's because I don't understand it.

24            MR. STURR:  Let me get to the more important point

25   about the record before you as to what was disclosed and when    02:43PM
```

UNITED STATES DISTRICT COURT

1   and whether there is, in fact, as Ms. Andresen has said, any

2   prejudice here.

3           So and I also want to address your point broadly

4   before I get to it.  This is not a case where we keep opening

5   doors and finding and changing theories.  That's not what        02:43PM

6   occurred here.  What occurred here is we made a disclosure once

7   we thought we could pursue the claim.  So we served a Rule 26

8   disclosure putting PetsMart on notice that we're going to

9   pursue the claim.  We were still trying to address what the

10  claim was and what the damages would be.  Our Disclosure         02:44PM

11  Statement says we're currently estimating it to be a claim

12  based on an extrapolation of the monthly revenues we did not

13  receive.

14          We quickly corrected that.  We engaged in discussions

15  with PetsMart's counsel.  We engaged in letters.  They served    02:44PM

16  discovery on us.  And by November of 2016, they had written

17  discovery responses that identified the theory of the case,

18  which is lost profits, and the method of calculation.  All of

19  that was --

20          THE COURT:  But method of calculation, what I heard       02:44PM

21  from Ms. Andresen was revenues minus cost.  Well, is there more

22  than that?

23          MR. STURR:  It was much more than that.  And the best

24  evidence for this, the best evidence in the record for you, and

25  this goes to the Rule 37(c) question of whether this was         02:44PM

harmless or not.  Now, if you look at the plaintiff's -- you

don't have it in front of you but let me cite it to you.  The

plaintiff's Motion to Compel, which is Doc 101, that was filed

on January 7th.  It expressly says, Pages 4 and 5 of Doc 101,

that it acknowledges that in November we served interrogatory            02:45PM

answers which disclosed an undisclosed damages calculation

based on lost profits for contract services as well as lost

profits for two other revenue sources, out of contract

services, ancillary work.  It goes on to quantify in the motion

what that was, the precise amounts:  3.5 million for the                 02:45PM

deferred billing, 13.4 million in lost profits for contract

services.

            THE COURT:  Go head.

            MR. STURR:  All of that was disclosed.

            THE COURT:  Footnote, right there.  Those two damages        02:46PM

sound inconsistent.

            MR. STURR:  I'm sorry, what?

            THE COURT:  Those two damages sound inconsistent.

Hard to see how you get both, both the back billing charge

because of the termination and this theory of lost profits for          02:46PM

the future.

            MR. STURR:  Your Honor, I don't want to get too -- the

question for you is what did they know and when did they know

it, okay?  And was this as they claim, or are they completely

in the dark and did we keep shifting our theories?  I want to           02:46PM

make the point that in November of 2016 there is no question,
none at all, that they knew that we were seeking approximately
$20.5 million of damages.

THE COURT:  Had you done an adequate Rule 26(a)
disclosure on it, and -- I mean, again, I don't want to throw
you off your train of thought.  But one of my concerns, you
don't have to answer it now, is was this done in a time frame
where it reasonably could have been completed discovery within
our case management schedule?  Because if it was done later
than that, there's a big problem.

MR. STURR:  This information was disclosed, the
damages we were seeking, it was disclosed initially in October
and the specific interrogatory answers that identified that the
amount we were seeking and the method of calculation and, most
importantly, Your Honor, our damage witness.

THE COURT:  What was my -- I'm sorry.  What was my
close of discovery time?

MR. STURR:  For fact discovery, it was late December.
And we did agree, we negotiated with Mr. Akbar, who was
predecessor counsel, to extend discovery deadlines in order to
accomplish the discovery based on these disclosures.  This was
agreed to by the parties.

THE COURT:  But it was not successfully accomplished
or else I wouldn't have been here to deal with this.

MR. STURR:  Judge, with due respect, I think your

UNITED STATES DISTRICT COURT

```
 1    understanding of the record I hope to correct, because I don't

 2    think that's really accurate.

 3           THE COURT:  Everybody can correct -- my understanding

 4    of the record is inferior to that of all others.

 5           MR. STURR:  Let me take you, Judge, we're in November.      02:48PM

 6    If there's any fact discovery to be taken it could have been

 7    done.  We decided, after taking the depositions of only those

 8    two PetsMart witnesses, we didn't want to take any more

 9    discovery.

10           THE COURT:  Slow down five miles an hour.  My court        02:48PM

11    reporter is authorized to issue speeding tickets.

12           MR. STURR:  Am I that bad?  Guilty as charged.

13           So what discovery occurred before the December cutoff?

14    We took the depositions of two of PetsMart's witnesses.  Ms.

15    Andresen was able to take the depositions of three witnesses in   02:48PM

16    Florida, I believe.  And the only other material witness in

17    this is Mr. Bull, the president of CMS, who we identified as

18    our damages witness.

19           So we understood that they could take discovery in the

20    damages portion of the case which had not been completed.  So     02:48PM

21    yes, this theory of the case, the method of calculating

22    damages, and the source material for that was disclosed in

23    November.

24           I want to take you back to Doc 101.  Before you issue

25    anything in this case, I'd like you to go back and look at it.     02:49PM
```

```
 1    Doc 101, Pages 4 to 5, here's why it's important, Your Honor.
 2    PetsMart summarized in its Motion to Compel what we had
 3    disclosed, by category, how it was calculated.  They attached
 4    an affidavit from Mr. Mroz.  Mr. Mroz conducts an analysis of
 5    our damages.  He has no trouble understanding the theory of          02:49PM
 6    damage, the amount of damage, and how they are calculated.  The
 7    only question that was presented by the motion was, do they
 8    have enough evidence of our costs in order to get --
 9         THE COURT:  Well, I don't think I read Mr. Mroz's full
10    report, but I think I had a general understanding of it.  But        02:49PM
11    my general recollection is the facts to underlie it, it's one
12    thing to come up with a simple theory of economics.  It's
13    another to have documents to back it up.  I thought that's what
14    he was complaining about.
15         MR. STURR:  Let me make one point here.  Hopefully              02:50PM
16    this will stick.
17         THE COURT:  You get to make all the points you want.
18    So go ahead.
19         MR. STURR:  The key point, and you've got your
20    highlighter out, from Doc 101 is this sentence:  After              02:50PM
21    summarizing what our interrogatory answers said, $20 million of
22    damage, CMS never formally disclosed in any Rule 26 filing an
23    intent to seek damages for lost profits from these revenue
24    sources.  They knew then -- now, I will get to why we didn't
25    issue a Disclosure Statement.  But the point is for purposes of    02:50PM
```

```
1    26(a), they knew in November, they have admitted in November,
2    even if it wasn't in a formal Disclosure Statement, the nature
3    of the damage claim and how it was calculated.  They attached
4    Mr. Mroz's declaration.  If you read his declaration he goes
5    into detail, Your Honor, about what we had already provided.       02:51PM
6    We had already provided information about our cost accounting
7    system, how we allocated for cost.
8            Ultimately the motion came down to two things:  They
9    wanted more information on our costs and they wanted more
10   information on mitigation.  But there was no question that they    02:51PM
11   understood and knew what the claim was.  We did not change it.
12   It was disclosed in November before the fact discovery cutoff.
13           THE COURT:  Well, you know, but that's part of their
14   challenge.  Another part of it is even if you actually
15   disclosed everything you had to, it was too late to be usable.     02:51PM
16   If you had disclosed it the day before the deadline, that's not
17   enough.  A month before the deadline, we're talking a month or
18   two months before the deadline.  So there's a practicality --
19   that's why the rule says that the supplements have to be
20   timely.                                                            02:51PM
21           MR. STURR:  But, Your Honor, let me go to another
22   point.  I just want to dispute what Ms. Andresen has told you
23   that our theories keep changing and shifting, et cetera.
24           THE COURT:  What about these two new components of
25   damages?                                                           02:52PM
```

1          MR. STURR:  They are not new components.  Let me jump

2     ahead to a point I want to make to you that you may not accept.

3     This is not in our papers, but I did tell Ms. Andresen this

4     yesterday in our meeting on the question of why didn't we do a

5     supplemental disclosure statement.  This may not constitute, it          02:52PM

6     probably doesn't in your mind, substantial justification but I

7     think you need to know why didn't we.

8          The answer is we were preparing a supplemental

9     Disclosure Statement in December in time for the deadline that

10    was consistent with the amendments we were making to our                 02:52PM

11    interrogatory answers.  It was in draft form.  It was ready to

12    be served.  We didn't do it, and that's my fault, Your Honor.

13    And then we set it aside because we received a Motion to Compel

14    that said we know what your damage theory is.  So the truth to

15    you, Your Honor --                                                        02:52PM

16          THE COURT:  They knew the theory.  They didn't have

17    the basis to see whether it's valid or not.

18          MR. STURR:  No.  No.  No.  No.  Go back.

19          THE COURT:  Go ahead.

20          MR. STURR:  Your Honor, that's not what they say.          02:53PM

21    They don't dispute the validity of the theory.  The Motion to

22    Compel says we need more information to bring their profit

23    number down.  It's not that they don't understand it or they

24    can't challenge it.  They just say we need more information.

25    And this is a direct quote from the motion.  All they were          02:53PM

1    seeking in that motion, "We're unable to determine if any of

2    these expenses should be excluded from the lost profits

3    analysis.  We need this additional financial information to

4    identify all variable expenses."  This was not a question of

5    sufficiency under --                                    02:53PM

6         THE COURT:  I thought your approach was you had just

7    as a general -- you looked to all your subsidiaries and came up

8    with a gross number as your overhead and you subtracted that

9    out.  I thought that was -- at least I remembered that earlier.

10        MR. STURR:  We provided as much as we could informally  02:53PM

11   and formally with information about the company's financial

12   situation.  We produced financial statements for the parent

13   company, all the subsidiaries.  We provided explanations for

14   cost.  We provided a tremendous amount of information.  Most of

15   the information they seek, and this is part of the challenge in  02:54PM

16   this case, this is a paperless company.  There are some 700,000

17   work orders that are relevant to the work it performs.  We have

18   tried, we began doing it back in December and January, to

19   provide them with all of that information.  It is a lot of

20   information but it's been provided.                     02:54PM

21        Ultimately, Your Honor, after the Motion to Compel was

22   granted, they have the entire general ledger.

23        THE COURT:  Part of what I want to say here is, and I

24   remember this from the Motion to Compel, it is not sufficient

25   to dump primary business data from which accounting data would  02:54PM

1    be compiled.  They don't have to compile the data.

2           MR. STURR:  Your Honor, we didn't do that.  We gave

3    them a summary of all of these costs and expenses.  And in

4    addition, in addition, we gave them the source documents, the

5    work orders.  We have since given them the entire general          02:55PM

6    ledger for the company.  We provided them, instead of dumping

7    700,000 work orders on them, we instead distilled all that

8    information into an Excel file that gives them, for every work

9    order the company has ever issued, the cost, who worked on it,

10   and other information that they say they needed.                   02:55PM

11          THE COURT:  So you are coming up with a, well, a sort

12   of a cost rate based on your averages of all your companies and

13   your subsidiaries, right?

14          MR. STURR:  We are -- the damages are based, in part,

15   on the revenue that was billed reduced for its costs.  And        02:55PM

16   there's been a very extensive and thorough analysis of what our

17   costs are.

18          THE COURT:  For your whole company?

19          MR. STURR:  Exactly.  Now the other point --

20          THE COURT:  Man, I can smell this Daubert motion           02:56PM

21   coming in six months.  But let's not worry about that now.

22          MR. STURR:  That's another trench I've got to get out

23   of with you.

24          But the point I want to make, Your Honor, going back

25   to the disclosure, because I want this -- I want you to           02:56PM

understand this.  I have said this to Ms. Andresen.  The

failure to serve it I will take responsibility for.  We set it

aside because we were so involved in trying to give them what

they wanted, comply with the Motion to Compel, and give them

information.  What we ended up doing, not because of your order          02:56PM

or not because we thought we had done anything wrong, we wanted

to give them a disclosure that synthesized in one place all of

our previous damages disclosure.  And the way this case has

worked, because of the nature of the financial information, we

have given them very large financial statements, Excel files,           02:56PM

these enormous spreadsheets that summarize various factors or

costs.  In fact, during Mr. Bull's deposition, in order to

facilitate the deposition we were providing, at their request,

additional spreadsheets.

    THE COURT:  They complain about that in their brief          02:57PM

that they were shooting in the dark at a target that was

supposed to have a spotlight shined on it.

    MR. STURR:  I don't know if it's shooting in the dark

or a minor error.  We disclosed before the deposition a minor

error in calculation and we give them a new spreadsheet and             02:57PM

it's a discussion at the 30(b)(6) deposition.

    Now, let me get to my main point, Your Honor.  We felt

that we had an obligation to provide -- and you may fault us

for doing this -- an updated Disclosure Statement that --

    THE COURT:  You do not get to improve your case.          02:57PM

1          MR. STURR:  I'm not improving the case, Your Honor.

2    What the Disclosure Statement does is goes back in time and

3    summarizes on prior dates what information we disclosed.  And

4    the point I want to make to you, and because Ms. Andresen has

5    mentioned it, I'd like -- if I may approach, Your Honor.          02:57PM

6          THE COURT:  You may.

7          MR. STURR:  This is Page 11 from the Disclosure

8    Statement.  There's a chart there, and I'm going to have to

9    speak from memory because I don't have it in front of me now.

10   You can see on various days that the amount of damages we seek   02:58PM

11   has not changed except incrementally, it's been reduced

12   slightly to correct the errors that we discovered in the

13   process in the method of calculation.  So if you go back and

14   look at each of those dates, our theory of the case, what we

15   have claimed has not changed at all.  And the reason we         02:58PM

16   provided this information is not to dump more information.

17   That printout of the spreadsheet Mr. Andresen has brought with

18   her for effect, all that is is a compilation of previously

19   disclosed spreadsheets.

20          There's no hiding of the ball here, Your Honor.  We       02:58PM

21   have said from November forward these are the elements of

22   damages.  These are lost profits.  This is how they are

23   calculated.  We discovered an error in January of 2017.  We

24   corrected it.  But we're still -- that correction was a 1

25   percent reduction in the total amount sought.  This is not a     02:59PM

1    case where we're impeding their ability to get information.

2         So what occurred since then?  So you granted the

3    Motion to Compel, and I know we'll talk in a minute about the

4    discovery there.  I disagree with what Ms. Andresen has said to

5    you.  We couldn't agree on what the scope of the order should          02:59PM

6    be.  When we began producing documents on May 1 and

7    interrogatory responses we tried to deadlines responsive to the

8    specific categories in Doc 118 that they had requested, and we

9    have done that.

10        THE COURT:  You had a big data dump, too.                         02:59PM

11        MR. STURR:  There's no data dump, Your Honor.  What we

12   provided is, in response to the request for information, we

13   provided a very large file.  We, A, we gave them the entire

14   general ledger.

15        THE COURT:  Well, I can't think of a better data dump             02:59PM

16   than the entire general ledger.

17        MR. STURR:  Your Honor, they asked for it.  Excuse me,

18   Your Honor.  This was the key point -- this is no data dump at

19   all.  So you have a company that's $150 million company.

20   Right, Michael?                                                        03:00PM

21        MR. ALLWEISS:  120 million.

22        MR. STURR:  They have the keys to the kingdom.  They

23   wanted it so we gave it to them.  We produced the entire sequel

24   file.

25        THE COURT:  I guess I'm wrong about that, but it is               03:00PM

1   clear to me they complained about being delivered with massive

2   data they did not request.

3        MR. STURR:  The complaint in the past may have been

4   that they didn't want all of the .pdfs of all the work orders

5   but we separately gave them a summary of what they said.  Now      03:00PM

6   we have 700,000 work orders.  They want to know what's our cost

7   structure.  So they want to analyze all those.  So what have we

8   done?  We gave them the entire general ledger so they can do

9   all that analysis.  And Mr. Mroz and his firm are capable of

10  doing that analysis.                                               03:00PM

11       We gave them, in a spreadsheet form, 700,000 work

12  orders.  So in that spreadsheet, it's going to summarize each

13  work order.  When I went to your house and fixed your air

14  conditioning unit it's going to give the date, the work order,

15  who performed the work and other information.  We could have      03:01PM

16  just dumped that on them.  We prepared this massive electronic

17  file and gave it to them at their request so they could use it

18  to further analyze the claims.

19       We have given them what they wanted.  We refrained

20  from producing the additional documents that we identified       03:01PM

21  because we didn't want them to accuse us of data dumping.  All

22  we're trying to do is to move forward, give them what they

23  want, and complete discovery here.

24       So if you look back, Your Honor, our position here is

25  we have not hidden the ball.  We have not changed our theories.   03:01PM

```
 1   You may disagree with us as to why we didn't disclose this lost

 2   profits theory until the summer of last year, but it's what it

 3   is.  And once we did it, we tried to act in good faith by

 4   writing letters, meeting, giving them information.

 5         And for purposes of this motion, Your Honor, we        03:02PM

 6   believe that the admission or the acknowledgment in their

 7   Motion to Compel that we had not made a disclosure pursuant to

 8   Rule 26, we haven't updated it, but they knew the substantial

 9   equivalent is right here.  It's summarized, it's analyzed, and

10   it hasn't changed since then.                                03:02PM

11         So for purposes of the rule, did they know our theory,

12   how we were calculating?  Yes.  They have had it since

13   November.  It has not changed.  The method of calculation we

14   have tried to adjust to make more accurate.

15         THE COURT:  Was that 30 days before the discovery       03:02PM

16   deadline?

17         MR. STURR:  Beg your pardon?

18         THE COURT:  You disclosed on November 15.  Was the

19   deadline December 15?

20         MR. STURR:  The fact discovery was the end of           03:02PM

21   December, I believe.

22         THE COURT:  Really?  I never set -- this is an old

23   case because I think I never set discovery deadlines at the end

24   of December because I don't want to ruin people's holidays.

25         MR. STURR:  No, we asked for it, Your Honor.  We went    03:02PM
```

1    to predecessor counsel and we said, here's what we're doing.

2    No surprise here.  We're amending.

3              THE COURT:  I mean my original deadline.

4              MR. STURR:  We stipulated to extend it.

5              THE COURT:  I'm not asking you that.  What was my          03:03PM

6    original deadline?

7              MR. STURR:  I believe, Your Honor, it was in --

8              THE COURT:  I'm going to guess mid-December.

9    Mid-December is my guess, but I haven't looked it up.

10             MR. STURR:  Our discovery plan had the initial            03:03PM

11   completion of fact discovery by September 30, which I think is

12   what you adopted.

13             THE COURT:  Well, if you disclosed this in November 15

14   and you are already past the deadline?  It must have been

15   extended before then.                                               03:03PM

16             MR. STURR:  I believe it was, Your Honor.  The

17   deadline as of August 30, Your Honor, the deadline was December

18   29 for completion of fact discovery.

19             THE COURT:  All right.

20             MR. STURR:  So, Your Honor, looking back at the big       03:04PM

21   picture, I'm sorry you feel you are in this swamp here.  From

22   our perspective, the story that you have been told that we have

23   deliberately delayed and hidden and concealed information

24   simply is not borne out by the record.

25             THE COURT:  I don't know that you need to have            03:04PM

1  deliberately delayed.  You just have to have delayed

2  prejudicially, if it was within your ability to disclose.

3          MR. STURR:  Well, my point is the information was

4  disclosed.  If you go back to their Motion to Compel, they knew

5  exactly what we were claiming.  The only issue was did they          03:04PM

6  have enough evidence; not to understand our theory, they wanted

7  more evidence to try to bring our damages number down.

8          THE COURT:  They wanted the data to see if your theory

9  actually cashed out.  That's what lawyers do.  They don't say,

10 oh, that's how much you want?  That's not how lawyers operate.      03:04PM

11 So anyway, go ahead.

12         MR. STURR:  Well, Your Honor, on this issue, our

13 position is -- I have tried to make it as clear as I can.  I do

14 believe that for purposes of Rule 37(c), whatever -- we don't

15 think that there was a -- that this was really a harmful          03:05PM

16 non-disclosure.  They knew what it was.  We don't think the

17 sanction they are seeking is warranted under these

18 circumstances, which is to preclude us from bringing this

19 claim.

20         THE COURT:  No, it's just holding you to your timely      03:05PM

21 disclosed damage computations.

22         MR. STURR:  Well, Your Honor, the damage calculations,

23 although they weren't set forth in a Disclosure Statement, were

24 known to them before the end of fact discovery in November of

25 2016.                                                             03:05PM

1        THE COURT:  Well, let me -- I don't want to cut off

2   anything you want to say.  I want to -- I touched on this

3   earlier.  But this is a very big consideration.  The discovery

4   rules and the case management schedules, it's not a "Gotcha."

5   If there's justification and good reason they will be extended.        03:06PM

6   But the -- forgive me for telling you what you already know,

7   but I deeply believe it or I would not be doing this job.  It

8   is essential to civil justice that disputes be organized,

9   prosecuted in an organized, timely way and that deadlines be

10  effectively honored.  You can get some slack here or there.        03:06PM

11        But the failure to do that back in the days when I was

12  a young lawyer was what brought the civil litigation system

13  into public disrepute.  It was a scandal because the process

14  could be abused.  People had ruinous expense.  And one of the

15  key solutions to that adopted in Arizona and in the federal        03:07PM

16  rules is have reasonable, effective case management where

17  people say, all right, here's what we've got to do.  We don't

18  get to do it when we feel like it.  We have to do it in a time

19  when other people can respond.  And all of the data show that

20  is essential to managing and keeping the cost of litigation        03:07PM

21  down.  So we don't enforce the schedule just to be mean.  We

22  enforce them because it's necessary to bring the still

23  ruinously expensive cost of litigation down some.

24        Now, what is -- most of the time that feels like an

25  abstraction because it's telling -- empowers the lawyers.  I        03:07PM

empower you to tell your clients, you have to get this done in

this time frame.  I remember it's a -- you are my lawyer, I

can't deal with this now.  Just give me more time.  No, no, we

have now empowered you to make your clients do things on time

and we make you do things on time.  In the long run, everything          03:08PM

gets done quicker.  You don't have reinventing the wheels with

lawyers and clients going back over and over.  You get it done

in an orderly time.

        What is remarkable about this swamp is that I'm seeing

here a dramatic demonstration of exactly that, that here we are        03:08PM

seemingly at the -- approaching the end of discovery, a month

before discovery is done after having been extended with a

profound transformation in the nature of the lawsuit that here

we are now still fighting about what has to be done.  Other

stuff has been done, maybe to naught.                                    03:08PM

        But the broad theory of taking the timely discovery

and disclosures is part of it, taking those responsibilities

seriously so as to prevent the mushrooming of the expense of

litigation, this is the poster child for it.  So most of the

time I enforce it because I fear the risks in the future.  Here        03:09PM

I see it in an absolutely dramatic, concrete way that a case

that was litigated on schedule, plan -- you reminded me, I

appreciate it, in the Rule 16 conference you put it all on the

table.  You knew that you had to fish or cut bait and you

didn't do it until a month before the disclosure.  So now this        03:09PM

1    has mushroomed.

2           So the question I have to address is -- I have to

3    address everything, but what's the best thing to do about that?

4    Do I just accept this 11th hour explosion of the litigation

5    into something new making it into a dramatically different        03:09PM

6    lawsuit five, six times the damages?  Do I accept that or do I

7    go back and see what I can do to salvage what should have been

8    done?  I have never had a discovery -- I have never had this

9    problem.  It's never come up.  This is the worst discovery

10   mess.                                                             03:10PM

11          I managed for two and-a-half years the big class

12   action -- your firm might have been on it.  Everybody was on

13   it -- challenging the health care of the state prison system,

14   all 10 prisons.  I had one or two discovery matters a week and

15   I had them decided within 24 hours and I had that case ready     03:10PM

16   for trial in two years and seven -- nine months.  So I promised

17   them that.  They said it's impossible, It happened, only

18   because we had a trial date and they did settle right before

19   trial.  But my point is at least that one I succeeded.  I got

20   everything done.  This one, this is a failure.  Just the whole   03:10PM

21   case has mushroomed into a whole different case right on the

22   eve of -- so this counts as more musings.

23          But I'm also telling you why I am seeing this as a

24   serious problem.  It's not just bean counting about time

25   limits.  That has a purpose to it, and the purpose here has      03:11PM

| | |
|---|---|
| 1 | dramatically failed.  So what can I do, what should I do, what |
| 2 | do I have authority to do, to bring this litigation?  I don't |
| 3 | care whether you try your case or settle it.  But we are going |
| 4 | to get it moved along.  You can do whichever you want.  But now |
| 5 | I'm -- so part of what I'm saying, Mr. Sturr, is all this stuff | 03:11PM |
| 6 | has a real world consequence to it.  It comes down to fairness |
| 7 | of preparation, cost of preparation.  And that's why I said |
| 8 | Rule 26 is you have to timely supplement once you know.  Well, |
| 9 | you knew when we sat in the Rule 16 that this is something you |
| 10 | had to deal with.  So you dealt with it a month before the | 03:12PM |
| 11 | close of discovery. |
| 12 | So anyway, I'm musing.  Here's what I want to do. |
| 13 | We've been going an hour and a half.  I want to take a short |
| 14 | break.  I'm always in fear OSHA will come after me for abusing |
| 15 | my court reporter.  We'll take a 10-minute break.  Then I will | 03:12PM |
| 16 | hear your brief reply and we'll see where we are.  All right. |
| 17 | (Recess from 3:12 p.m. until 3:23 p.m.) |
| 18 | THE COURT:  Ms. Andresen, you may reply. |
| 19 | MR. STURR:  Your Honor, may I -- |
| 20 | THE COURT:  If you are not done, that's fine.  Go on. | 03:23PM |
| 21 | MR. STURR:  Your Honor, frankly, I am concerned with |
| 22 | your closing comments that you are of the view, I take it, that |
| 23 | this is a theory that we could have pursued and didn't pursue |
| 24 | from the beginning.  If I wasn't clear before, let me try one |
| 25 | more time. | 03:23PM |

1        If there is -- if there was a proper termination, this

2   was the original theory of the case that they had the right to

3   terminate, then we were suing for our contractual remedy, the

4   deferred billing.  That was the theory of the case.

5        THE COURT:  You know, that's taking me -- I thought        03:23PM

6   you were suing for wrongful termination, but maybe I am

7   assuming that.

8        MR. STURR:  We asserted that they did not properly

9   follow the contract which said you can only terminate if you

10  have paid all invoices in full, and they hadn't.               03:24PM

11       THE COURT:  What invoices were not paid?

12       MR. STURR:  The deferred billing amounts.

13       THE COURT:  That sounds like a chicken and egg

14  argument.

15       MR. STURR:  That was the theory, Your Honor.  And if       03:24PM

16  you then conclude that you don't have the right to terminate at

17  all, which is what we discovered, then we say you have

18  wrongfully exercised that right.  We didn't know that, and we

19  didn't think we could seek damages for the balance of the

20  contract until we completed that discovery which was in         03:24PM

21  September -- taken on September 9th.  We made the disclosures

22  by the end of that month.

23       So we did disclose this information.  And I'm sorry.

24  I have done the best I can to try to convince you, Your Honor,

25  this is not something we sat on.  We didn't think we had the    03:24PM

1    ability to pursue that argument until the summer of last year.

2    We then had the balance of the year to complete the discovery.

3    When we amended our complaint, we did so with plaintiff's

4    consent, understanding what the theory was, what was remaining.

5              The other thing I hope -- I want to leave you with,          03:25PM

6    Your Honor, is that in terms of the schedule, what we're

7    talking really about is what you would normally call expert

8    discovery or damages discovery.  We bifurcated it.  We

9    concluded the fact discovery, but we deferred after the first

10   of the year at what damage is discovery.  We are not using an        03:25PM

11   expert.  We disclosed we would be using Mr. Bull as our damages

12   witness, and so all of that was still deferred.

13             So whatever late disclosure you may think occurred, it

14   didn't affect --

15             THE COURT:  They complain that Mr. Bull is an              03:25PM

16   I-don't-know-nothing witness at the end of discovery.

17             MR. STURR:  Your Honor, we could have supplemented,

18   and I should have supplemented the record to show the balance

19   of that deposition transcript.  We don't think it's a fair

20   summary.                                                             03:26PM

21             THE COURT:  Everybody always quotes the best part of

22   the deposition.

23             MR. STURR:  Exactly.  It was a two-day deposition.

24   The point is, is there any mystery now about what the theory of

25   the claims are now?  No.  So our closing remark, or concluding      03:26PM

1    remark, is we don't think that in terms of the harm this has

2    had on the plaintiff, it really has not.  They have already

3    taken two days of deposition.  They have gathered all the

4    information they need.  Whatever additional information they

5    want to challenge or question our costs, which is what Mr.          03:26PM

6    Mroz --

7              THE COURT:  You are not going to put on an expert, you

8    are just going to have Mr. Bull get up and propound --

9              MR. STURR:  701 witness, yes, Your Honor, as a person

10   with knowledge.  We may call -- we have built into the             03:26PM

11   schedule, Your Honor, the ability to call a rebuttal witness.

12   So as we contemplated this back in the fall and the plaintiff

13   agreed we would finish fact discovery by the end of the year,

14   they didn't identify knowing our --

15             THE COURT:  This is expert testimony.  How does --       03:26PM

16   just because he's a litigant, how does he get --

17             MR. STURR:  He has personal knowledge to give an

18   opinion, I believe, under 701 -- 702, excuse me -- as to -- as

19   an opinion as to the damages the company has experienced.  That

20   was fully disclosed, Your Honor.  That's in our Disclosure         03:27PM

21   Statement.  So they have known that so we were bifurcating the

22   case from fact discovery.

23             THE COURT:  What has been the disclosure, just what

24   came out in the deposition?  Have they ever put together

25   anything other than I'm the guy and here's what I think?           03:27PM

1          MR. STURR:  It was disclosed in a number of places.

2     The interrogatory answers disclosed that Mr. Bull would be the

3     expert witness providing damages.  It provided information

4     about how they were calculated.  We have sent a lengthy letter

5     December 6, other letters that are in the record.  All that          03:27PM

6     information was provided.  Now, by the end of the year if they

7     had concerns that they needed more fact discovery they didn't

8     ask us to extend the fact discovery deadline.  What we're

9     talking about at that point is we had a period of time within

10    which for them to depose Mr. Bull, for their expert to issue a       03:28PM

11    report, for us to then depose their expert.  If we wanted to we

12    could call a rebuttal expert then take additional discovery.

13    So the impact of this on the case is, really, is all on the

14    expert side or damages side of the case which is ongoing and

15    not concluded.                                                        03:28PM

16          So in terms of unwinding the clock, I'm not sure what

17    there is to do.  They have known since November what the theory

18    is.  They don't have any other facts witnesses.

19          THE COURT:  You and I speak past each other by knowing

20    what the theory is.  You can say the theory in three sentences.      03:28PM

21    That doesn't make a case or give you a discoverable case.

22          MR. STURR:  I'm sorry, Your Honor.  What I'm not very

23    well saying is I'm trying to say for purposes of the Rule 26,

24    what is the claim that is being pursued, how are the damages to

25    be calculated, and what is the amount.  That information,            03:28PM

1   that's really the thrust of 37(c), or the motion, rather.

2   That's all we're supposed to disclose in our 26(a)(1).

3          THE COURT:  How it's calculated.  Anyway, I

4   understand.

5          MR. STURR:  It's there.  So, Your Honor, I wanted to          03:29PM

6   make that last point.  And lastly, if you were contemplating,

7   Your Honor, striking the claim --

8          THE COURT:  I'm contemplating everything.

9          MR. STURR:  Well, my request would be --

10         THE COURT:  I'm not striking the claim, it's just --          03:29PM

11  go ahead.

12         MR. STURR:  We would ask, Your Honor, I have given you

13  just an excerpt from our supplemental Disclosure Statement.

14  But the purpose of that supplemental Disclosure Statement is

15  not as Ms. Andresen suggested to come up with new theories but          03:29PM

16  it does lay out in one place, start to finish, when we

17  disclosed, what we disclosed, what the amounts are, and how

18  they have really not varied.  We would ask the Court to grant

19  leave --

20         THE COURT:  If you would like to hand me --          03:29PM

21         MR. STURR:  We would like to submit it for the record.

22  I don't have it with me.  I don't know that you want it, Your

23  Honor, but I can give you the balance of the disclosure.  May I

24  leave that with you?

25         THE COURT:  Balance of what?          03:30PM

1          MR. STURR:  I gave you one page out of our Disclosure

2     Statement.

3          THE COURT:  This is the stuff you just gave today?

4          MR. STURR:  Yes.

5          THE COURT:  Oh.  You may.  Sure.  I have to figure out     03:30PM

6     whether it matters.

7          MS. ANDRESEN:  I have a spare copy if you would like

8     it.  I was planning on using it myself.  You are saving me the

9     trouble.

10         MR. STURR:  If I may approach.     03:30PM

11         THE COURT:  Is this my copy?

12         MR. STURR:  This is your copy.

13         THE COURT:  Do I get both of you to autograph it?

14         MS. ANDRESEN:  There's one signature on it already.

15         MR. STURR:  Your Honor, again, the purpose of the     03:30PM

16    supplemental disclosure, as untimely as it is, was really to

17    summarize in one place all that has occurred in the past.  We

18    think it rebuts the arguments you have heard today and it

19    really makes --

20         THE COURT:  You know, I have read the papers that we     03:30PM

21    come here with.

22         MR. STURR:  We wanted to have this argument because we

23    believe the record is confusing and complex.  But this will

24    distill in one place what happened and when and where things

25    stand.  So with that, anything else?     03:31PM

1          THE COURT:  All right.  Good.

2          MR. STURR:  Thank you for the time, Your Honor.

3          THE COURT:  Any reply?

4          MS. ANDRESEN:  I will try and keep this -- have some

5    flow to it, although I have got a lot of points kind of across          03:31PM

6    the board I would like to hit.

7          With respect to Mr. Sturr's last statement about Mr.

8    Bull being disclosed as their witness on the damages, that

9    disclosure came in the Disclosure Statement that was just

10   handed to you.  That was the first time he was disclosed as a          03:32PM

11   witness on the damages.  So if you turn to Page 2 of that

12   Disclosure Statement, you can see in bold and italics where he

13   was disclosed to testify on the calculation of damages.  That

14   was the disclosure we received last Thursday.

15         THE COURT:  I thought he just told me he's always been          03:32PM

16   their witness for damages.

17         MS. ANDRESEN:  He was never disclosed as a witness on

18   that.  The prior disclosure statement listed him as a fact

19   witness on the, let's see, on the termination, the agreement,

20   the five-year, the statement of work, the reasons for          03:32PM

21   terminations, and it says CMS's resulting damage.  That's the

22   most it says about him on damages.  So the first time he was

23   disclosed as a witness on the expert damages, on the lost

24   profits claim in a formal Disclosure Statement was last

25   Thursday.          03:33PM

1          They have said all along, and I'm sure you recall this

2     from our Motion to Compel, when we had questions about things

3     they kept saying when you take Mr. Bull's deposition, you will

4     understand.  He'll be able to answer all the questions.  He's

5     the only witness that knows anything about this.  So they did          03:33PM

6     say that informally in our meet-and-confer process but there

7     was no formal disclosure by him of that by any deadline.

8          The other reason I intended on handing you this

9     Disclosure Statement myself is on Page 11, the table that

10    identifies what CMS is claiming to be their disclosure of these       03:33PM

11    damages.  The very first date that they say they disclosed a

12    lost profits claim is November 15th of 2016.  That was one day

13    after the last day to serve any written discovery.  So PetsMart

14    found out about that the day after that deadline.  So they were

15    unable to serve any additional written discovery under the            03:34PM

16    scheduling order on that newly disclosed claim.  And again,

17    that was disclosed by attaching a separate set of documents

18    like the pile over there.  There was a summary sheet and a

19    giant Excel spreadsheet that was more than a foot high.  And

20    that was the disclosure.  They had an interrogatory response          03:34PM

21    that referred us to that pile of an Excel spreadsheet that

22    required Mr. Mroz and his team to go through it before I could

23    come close to understanding what had been disclosed.

24          Prior to that the only Rule 26 disclosure was a

25    disclosure of lost revenues.  That was all that was formally          03:34PM

1    disclosed.  And as a result, PetsMart tailored its discovery

2    that it served in October, last round of discovery, to that

3    lost revenue claim.  Specifically, they said -- we asked:  What

4    is your legal and factual basis for saying you are entitled to

5    the full monthly contract price for the remainder of the                03:35PM

6    contract?  And yes, of course, we sought discovery on expenses

7    and variables costs because our intent was to say lost revenue

8    is not an appropriate claim.  We're going to say that it must

9    at least at a minimum be reduced by some of the expenses.

10          And there was back and forth on every single document       03:35PM

11   that we received.  Initially, we received only the consolidated

12   financial statement for the parent and they told us the

13   individual statements did not exist.  We pushed and pushed and

14   they agreed to create financial statements.  Then they produced

15   some supplemental documents that were the individual financial     03:35PM

16   statements that they said they created for purposes of the

17   litigation.

18          They also continued to produce volumes of Excel

19   spreadsheets related to work orders for other customers that we

20   did not request.  These were the 130,000 pages, the 170,000       03:36PM

21   pages and this included until after the Court's order.  Again

22   they produced large volumes of Excel spreadsheets that we did

23   not ask for and did not have meaningful information.

24          As to the sequel database that supports their general

25   ledger, that is something we requested.  Because all along --     03:36PM

1          THE COURT:  What is that again?

2          MS. ANDRESEN:  The sequel database.  So that is the

3    database for a select number of years where the general ledger

4    balance sheets' financial statements are created out of that

5    underlying evidence.  And so our expert wanted that evidence to          03:36PM

6    test and make sure it tied into the financial statements and

7    that it matched this Excel spreadsheet that they gave us of

8    their damages, those Excel spreadsheets that they gave us there

9    that suggested that it copied all of the expenses and labor

10   rates that they were attributing to the PetsMart contract.          03:37PM

11         We believe that they were vastly undervaluing the

12   variable costs.  And the only way to test that, because they

13   kept telling us it was only labor and materials, was to get

14   underlying documentation so that we could look at the financial

15   statement and figure out which expenses went into that          03:37PM

16   financial statement that should be attributable to the PetsMart

17   contract.  The reason we wanted the sequel database, the actual

18   database is so we could run searches and reports out of that

19   database in order to support their analysis of the underlying

20   claim.  So that was one of the things we asked for in the          03:37PM

21   Motion to Compel.

22         But the important thing is so November 14th, the last

23   day to serve written discovery, the day after that we get the

24   interrogatory response.  In that interrogatory response it was

25   the first time they had ever mentioned these two other          03:38PM

1    categories of revenue that they thought they could seek.

2           THE COURT:  I'm sorry, what was the date on that

3    again?

4           MS. ANDRESEN:  November 14th was the date of the last

5    day to serve written discovery.  So on the PowerPoint handout I          03:38PM

6    gave you, on Page 10, there is this timeline.  So November 14th

7    was the last day to serve written discovery.  November 15th is

8    the date they give us the interrogatory response.  And the

9    first set of spreadsheets like that, this is now a modified, a

10   new set of spreadsheets with modified data that's correcting          03:38PM

11   errors and changing some things.  We have not yet been able to

12   figure out what all has changed in there, but our experts are

13   working on that as we speak.

14          There was nothing else given to us before the December

15   29th deadline.  They rely on their Disclosure Statement in a          03:38PM

16   letter that was sent from Mr. Allweiss to me in which they said

17   he disclosed another calculation of the lost profits.  That is

18   in their Disclosure Statement.  It's referenced in the chart.

19   That letter from Mr. Allweiss was a letter in our

20   meet-and-confer process.  We were asking for additional          03:39PM

21   information from him.

22          And specifically, we said, you can't possibly be

23   seeking lost profits for ancillary work and out-of-contract

24   work on your breach of contract claim.  It's never been

25   discussed in this litigation.  We think we see some analysis of          03:39PM

1   that in this Excel spreadsheet.  That can't possibly be what

2   you are seeking here, because that does not make sense.  It's

3   never been disclosed.  And in response, Mr. Allweiss says, yes,

4   we are.  And here, and references back to the Excel

5   spreadsheets that he gave us.  And there was numbers in there      03:39PM

6   and when I read the letter, I did not notice that the numbers

7   did not match the summary that's in this foot-tall thing.  And

8   he told us to essentially pound sand.  We're not giving you any

9   more information.

10          I did not view that letter as a supplement to any kind     03:40PM

11  of disclosure whatsoever.  I don't think there is any case out

12  there that suggests a letter telling us they are not going to

13  give us additional discovery and referencing a lost profit

14  amount in referencing back to a supplemental interrogatory

15  response is compliant with Rule 26.                                03:40PM

16          And if you look again at Page 11 of that Disclosure

17  Statement, every other disclosure what they are calling a

18  disclosure, these were never in a Disclosure Statement -- these

19  were supplemental interrogatories responses -- or the

20  deposition.  Every single one of those is after the close of     03:40PM

21  fact discovery.  Every single one of those is changing the

22  damages calculation.  It's changing the amount.  And every time

23  they change an amount it results in us having to reevaluate the

24  claim and try and determine in that stack what is changing, why

25  is it changing, what errors were they correcting.                 03:40PM

1            And again, a lot of this was done in response to

2    PetsMart's expert report, PetsMart's deposition questioning,

3    all of the things PetsMart was doing to break down their

4    damages and show why they were unreliable and shouldn't be

5    sustained.  And instead of responding in a rebuttal they          03:41PM

6    decided to just correct the factual record and change the

7    factual record after we had already made our position firm in

8    formal disclosures.

9            That caused a lot of harm.  That is not what -- and

10   again, all of this is after the close of discovery.  That is      03:41PM

11   the problem here.  No matter -- every time we ask for some

12   additional information to evaluate something the response is we

13   get something we didn't ask for.  And it's usually something

14   voluminous and something we don't understand and then there's a

15   whole lot of back and forth again, and that is now injected       03:41PM

16   into the record.  We haven't produced or put anything in record

17   after the close of the discovery deadline on December 29th.

18   CMS has put giant volumes of information into the record, most

19   of which we did not request.

20           That is the fairness argument.  That is why we believe     03:42PM

21   that the damages should go back to the last final Disclosure

22   Statement that had an actual disclosure of damages, and that is

23   what CMS should be required to live with.

24           In response to the argument that they didn't know that

25   PetsMart terminated the contract under the termination for        03:42PM

1    convenience provision, because, in part, because of price is

2    absolutely unfounded.  In our Motion to Compel we attached an

3    exhibit as one example of that.  When PetsMart was looking to

4    change contract providers, again, PetsMart all along, in every

5    contract, it always has a right to terminate for convenience          03:42PM

6    for either party upon 30 days notice.

7          THE COURT:  I do recall that and that allegedly it was

8    just done for a better price.  I recall that.  I can't remember

9    if it was at the Rule 16 conference or later.  But that's -- I

10   remember that.                                                        03:43PM

11         MS. ANDRESEN:  It's a standard term.  And CMS was

12   trying to entice PetsMart to take that out of --

13         THE COURT:  Specifically I remember the contention

14   that that's why this one was terminated.

15         MS. ANDRESEN:  Correct.                                         03:43PM

16         THE COURT:  Go ahead.

17         MS. ANDRESEN:  And when it did that it issued a new

18   request for proposal to bunch of difference HVAC providers

19   including CMS.  It sent them a proposal and said, we're looking

20   to have a new provider, and it gave them documents that said         03:43PM

21   specifically they were looking for a more cost-effective and

22   cost-competitive price so that it would be a total cost savings

23   to them.  It was in the RFP.  That was their main consideration

24   in finding a new provider.  This was before the contract was

25   terminated.                                                          03:43PM

1        So for CMS to sit here and suggest they didn't know

2   PetsMart was looking for a better price, PetsMart had been

3   complaining all along that it couldn't afford the cost that it

4   was is just simply untrue.

5        THE COURT:  That was their discounted cost.                03:44PM

6        MS. ANDRESEN:  And that was their discounted cost, and

7   PetsMart couldn't afford the discounted cost.  It was taking it

8   out of its budget.  The discounted cost was higher than what

9   the attachment to the agreement said would be the price.  So

10  there's a disagreement there.  No need to digress.              03:44PM

11       In the Motion to Compel reply, Exhibit 2 at Page 5, we

12  provided at least one document that showed this RFP that

13  PetsMart issued to CMS as well as others said we're looking to

14  replace the provider, and cost-competitiveness was a

15  consideration.  So there's no secret they were looking for a    03:44PM

16  better price.  And again, the Court already pointed out at the

17  Rule 16 conference it was discussed that lost profits, they

18  needed to fish or cut bait.  Their very initial Disclosure

19  Statement suggested they had a placeholder for lost profits and

20  they eventually deleted that out of their Disclosure Statement. 03:44PM

21       We just think everything that has happened from

22  November 15th forward is untimely and it's caused prejudice to

23  PetsMart.  PetsMart has been unable to keep up with, in fact,

24  it feels at times we have been drinking from a firehose of

25  information in trying to figure out what is helpful, what is    03:45PM

1    harmful, what was requested, what is it matching the different

2    information they are giving us.  And because this happened

3    after written discovery closed when we were no longer able to

4    serve any more, we could not serve any requests on their new

5    lost profits instead of lost revenues theory, there were two          03:45PM

6    new revenue sources that had never been disclosed.  That's the

7    ancillary work and the out-of-contract work.  No discovery on

8    those.

9            THE COURT:  And that was disclosed in November?

10           MS. ANDRESEN:  That was in response to our               03:45PM

11   interrogatory.  That was included in our spreadsheet on

12   November 15th.

13           The burdened labor rate, which was not disclosed until

14   January 13, and then their supplemental burdened labor rate

15   that was not disclosed until May 1st in response to this              03:46PM

16   Court's order, which was not something we requested them to

17   supplement.  We have not been able to have discovery on any of

18   those things.  And importantly, we have already drawn a line in

19   the sand on a lot of issue and put forth our position and

20   formal disclosures on these damages and now they are adjusting       03:46PM

21   the factual record after the fact, correcting errors, fixing

22   all the mistakes in their database and their underlying, you

23   know, document calculations and changing their disclosure,

24   trying to disclose a new witness on the damages.  And part of

25   the problem for this is they chose not to have an expert submit      03:46PM

1      a report for PetsMart to aim at.  And that was just doubly

2      difficult because they didn't disclose it in a Rule 26

3      disclosure, and they didn't have a formal expert disclosure.

4      So this sifting sands approach of changing their calculations,

5      changing the documents, its been difficult.                        03:46PM

6              There was some discussion about the documents given to

7      PetsMart in advance of the deposition, and I wanted to correct

8      that.  Those documents were given in the middle of the

9      deposition when we put the documents from the database that we

10     had been given up until that point in front of the witness.  We   03:47PM

11     not only had printouts, giant printouts of documents like this,

12     we also had a computer and we were putting it up on a screen so

13     we could manipulate the Excel files and change tabs if that was

14     necessary.  And when we were talking to the witness and

15     questioning him on that, he said he didn't recognize what we      03:47PM

16     were looking at.  He said that was not the spreadsheet he

17     prepared, and he needed to look at the one on his computer to

18     answer our questions.  And, of course, this is after he told us

19     he did nothing to prepare for the deposition other than create

20     the first round of that Excel spreadsheet which we believe was    03:47PM

21     produced in November.

22              At that point we had to take a break.  We had to get a

23     thumb drive.  We had to download on the --

24              THE COURT:  Five miles slower for you, too.

25              MS. ANDRESEN:  We had to download on thumb drive that     03:48PM

1    full database which disclosed a new calculation that had a

2    summary sheet on the front of that, on that thumb drive, that

3    adjusted their calculations again.  So on the spot we had to

4    adjust and respond to that and asking questions on that.

5           So whether he found out about those changes and          03:48PM

6    mistakes in advance of the deposition, we didn't learn about it

7    voluntarily.  We walked into it when we questioned him and he

8    couldn't answer our questions on the documents they had

9    disclosed.  And this, again, just continues to demonstrate the

10   problems we face because there has not been any formal           03:48PM

11   disclosure.  And we just don't think any amount of discovery at

12   this point could cure that prejudice, which is why we would

13   like the Court to go back to the original disclosure and the

14   damages that were asserted in a timely fashion.

15          Other than that, I think I have addressed all the         03:49PM

16   points Mr. Sturr made that I wanted to respond to.  So unless

17   the Court has any questions for me.

18          THE COURT:  No.  Take a seat.  I just want to look at

19   something.

20          MR. STURR:  Your Honor?                                   03:49PM

21          THE COURT:  Yes.

22          MR. STURR:  Sorry to interrupt.  Mr. Allweiss is the

23   lead counsel on this case.  I know it's unusual because you

24   have already heard argument from me and Ms. Andresen has

25   already replied, I think there are a few key points.            03:50PM

1    THE COURT:  You know, we only allow one lawyer to

2    argue per side and there's good reasons for that.  If you want

3    to confer with him, I'm reading something, and I will give you

4    a few moments if you want to say something further.

5    MR. STURR:  No, Your Honor.  That's fine.                    03:50PM

6    THE COURT:  All right.  I was looking back at the

7    complaint, and the complaint only alleges a failure to pay the,

8    what do you call it again, the increased standard rate?

9    MS. CRAWFORD:  Deferred billing.

10    THE COURT:  The deferred billing.  It's the stuff in    03:57PM

11    Exhibit C, right?

12    Well, I will tell you, I didn't have a plan as to how

13    I was going to deal with this when I set this hearing.  And the

14    discussion has been very helpful.  I just knew we had to get it

15    moving along.                                               03:57PM

16    First, I do conclude, I am persuaded, that the

17    disclosure of these lost profits was untimely; did not meet the

18    requirements of Rule 26 of timely disclosure.  And it's not an

19    abstraction, as I incorporate my prior speech on that.  It

20    serves as a real purpose.  The disclosures have to be done in   03:58PM

21    time for people to prepare the case, do the discovery, and so

22    you don't just get to hold back.

23    Now, what I am seeing here is what we see and used to

24    see all the time of people just not getting down to doing

25    things.  But in this process, it can be highly prejudicial and  03:58PM

1    it causes exactly what we have seen here.  So Rule 26(a) is

2    not, you know, you have to timely disclose it when you know it.

3    I was leafing through the transcript of our January 2016

4    hearing, and it was quite clear there that this had to be

5    addressed.  Frankly, as I read the complaint, I don't even see          03:59PM

6    lost -- it's a suit for the deferred whatever.  That's what

7    it's for.  There was a discussion about lost profits, but it's

8    not in the complaint and there was no -- certainly not a timely

9    disclosure that has resulted in dramatic prejudice in very,

10   very concrete multiplication of the expense of litigation from          03:59PM

11   what it was as set up and is ready to go to what it has turned

12   into now.

13          So I frankly have no difficulty concluding that these,

14   wholly apart from the fact there's no expert, these disclosures

15   of damages were not done at a time that could be reasonably             04:00PM

16   responded to within the case management plan, not even close.

17          And there's another dimension here that has been

18   expanding.  Mr. Bull couldn't testify about things, didn't know

19   about things; the evolving disclosures; the use of my order to

20   beef up the plaintiff's case is directly contrary to what I             04:00PM

21   contemplated and proves, yet again, that the failure to

22   disclose this in a timely fashion has caused great expense and

23   burden.

24          So there's a complication here that the defendant

25   didn't seek this relief initially.  Reviewing all this, first          04:00PM

of all, I have -- I appreciate it in every case, and I have
appreciated it in this case as to what I thought was the
cooperation of the parties and counsel.  And the next question
is what do I make of the fact that the defendant did not seek
this relief and it went further.  Well, my conclusion is I                04:01PM
expect good faith from everybody, and the question do I hold it
against the defendant that they thought they could deal with
this, well, I think I should not hold it against them that they
tried in good faith to accommodate things.  But I am persuaded
that rather than just racking it up quickly with a little more            04:01PM
time it has just continued to expand and expand and expand as
disclosures were made and details changed and, in effect, new
-- I take the defendant at their word that there have been
attempts here to rebut the expert report.

So it's ongoing discovery.  It's improvement of                           04:02PM
ongoing discovery.  It is exactly what the disclosure, timely
disclosure, is meant to restrain.  I'm having difficulty seeing
very severe prejudice in the multiplication of the litigation.
Even now I think my characterization earlier on is correct that
we're just seeing a new damage case, a new discovery.  The                04:02PM
plaintiff elects not to present an expert witness, I have not
encountered it so I don't know the answer, but I'm not sure an
owner can come in and testify about something that is
intrinsically expert as opposed to I'm just a guy and I know.
I'm not foreclosing that.  I haven't run into anybody who tried           04:03PM

1    to do that before.  I know an owner of real property can

2    testify.  And I don't have to resolve that.  But so -- no.  I

3    have heard from everyone.  I'm delivering my ruling.

4         There's been finger pointing here about bad faith.

5    This looks like customary procrastination that is exactly what    04:03PM

6    the rules in the schedule are meant to hem in, except the harm,

7    the prejudice, has been obvious and dramatic in this situation.

8         So I'm inclined not to hold it against the defendant

9    that they tried to work this out and that things just kept not

10   getting nailed down.  And it is unrebutted here that massive     04:04PM

11   new data not requested has been delivered.  It's trying to set

12   the stage for a different lawsuit.

13        So I'm persuaded that this is a serious violation of

14   Rule 26.  I conclude the defendant should not be prejudiced by

15   having tried to work with it.  But the events have showed that   04:04PM

16   that was a failure.  And so now I either accept failure and

17   push the reset button on a major part of this case, here we are

18   six months after the expiration of the discovery date.  And my

19   judgment is not to do that, to try to repair this as best we

20   can, to take this case back as close as we can to where it       04:05PM

21   would be without excusing the untimely disclosure of the lost

22   profits issues and untimely in a way that could have -- it

23   could not possibly have been met the time, could not possibly

24   have met the case schedule, even with some modest extensions

25   could not have met it.                                           04:05PM

1        So this is a case where people have to formulate their

2   lawsuit and their defense, and the train leaves the station.

3   And you can't have an unwilling passenger on the train that you

4   would want to take back to the station.

5        So I will add just a footnote, if the universe had          04:06PM

6   turned out different, it's not at all clear it would be any

7   different, that such damages would have been provable.  But, of

8   course, we don't know.  As I said before, I have never had to

9   confront this situation before going back because I don't think

10  it would be just to deem the defendant estopped because they     04:06PM

11  tried in good faith to deal with this ever-expanding damage

12  stuff.  But then I have never experienced anything like this

13  either, 13 years on the bench or 30 years in law practice, I

14  have never experienced anything post-discovery multiplying

15  damages like this.  So I fashion the resolution that I think     04:07PM

16  most fair and I, right or wrong, I'm comfortable this is well

17  within my authority under the rules under Rule 26.

18       So now I want to talk through how to best achieve

19  that.  Let me start with the defendant.  Was there anything

20  left that needed to be done with respect to the initially        04:07PM

21  disclosed damage theory, or did you -- do you have what you

22  needed on that?

23       MS. ANDRESEN:  The deferred billing, that discovery is

24  complete.

25       THE COURT:  So that means we don't -- I don't think I       04:08PM

1    need to set anything with respect to discovery.  And we need

2    to -- our schedule is completely off now so I need to reset a

3    schedule for motions.  I guess we're up -- I'm not asking for

4    any motions for summary judgment.  Does anybody plan to file

5    any?                                                             04:08PM

6              MS. ANDRESEN:  The defendants do plan on filing.

7              THE COURT:  Is it -- well, I'm not going to hold you

8    to it, but the whole case, or what issues particularly are you

9    thinking of moving on?

10             MS. ANDRESEN:  Contract interpretation, the legal      04:08PM

11   interpretation of the contract.  Thinking off the top of my

12   head I know that's the one.

13             THE COURT:  Have you had discovery on parol evidence

14   on that?

15             MS. ANDRESEN:  Yes.                                    04:08PM

16             THE COURT:  Are there different stories?

17             MS. ANDRESEN:  Yes.

18             THE COURT:  That shouldn't be a Motion for Summary

19   Judgment then.

20             MS. ANDRESEN:  Well, there's some merger clauses in    04:08PM

21   the contract, and so that's the motion that we're currently

22   exploring.

23             THE COURT:  All right.  Does the plaintiff contemplate

24   any motions?  I'm not holding you to it.  If you decide later,

25   that's fine.  I'm just trying to plan a schedule.                04:09PM

 1              MR. ALLWEISS:  Yes, Your Honor, we do.  We have a

 2    Motion for Summary Judgment.

 3              THE COURT:  Tell me what it's going to be.

 4              MR. ALLWEISS:  It's going to be on the issue of

 5    liability as to their termination for convenience.                    04:09PM

 6              THE COURT:  What's the sub-issue there that --

 7              MR. ALLWEISS:  That by law a termination for

 8    convenience is not equivalent to a termination at will, and

 9    it's a matter of black letter law that if you terminate for

10    convenience but the only reason you cite is in order to get a         04:09PM

11    better bargain or a better price that is per se a bad faith

12    violation of a termination for convenience clause.

13              THE COURT:  You know, I understand that.

14              MR. ALLWEISS:  And the person that made the decision

15    to terminate the contract, we took his deposition in September       04:10PM

16    and he admitted to it 15 ways to Sunday.

17              THE COURT:  Sounds like there's no secret about it.

18              MR. ALLWEISS:  Oh, no.  There was actually a secret,

19    Judge.  They didn't tell us until like, I don't know, whenever

20    they gave us the notice in April.  They had led us to believe        04:10PM

21    all along that they were going to continue to work with us and

22    they were -- but what we found in discovery was they had their

23    own meeting in December of 2014 and amongst themselves with

24    their consultant, they had already decided to fire us.  But for

25    the next four months they led us to believe --                       04:10PM

1          THE COURT:  What about the requests for proposals

2     that -- tell me your name again.

3          MS. ANDRESEN:  Meridyth Andresen.

4          THE COURT:  Andresen.  Those Scandinavian names all

5     sound the same.                                           04:11PM

6          But she said they sent out requests for proposals

7     before they terminated your contract.

8          MR. ALLWEISS:  That's right, they did.  We objected.

9          THE COURT:  How is there a secret then?

10         MR. ALLWEISS:  Well, when -- the decision to terminate   04:11PM

11    us, the reason for why that was, was kept a secret.  They had

12    decided already in December without telling us that they were

13    going to fire us.  The real question I think that Your Honor is

14    getting to is when they send out the request for proposal while

15    there's a contract in place, did we object to that?  Did we go   04:11PM

16    to them and say, you can't do this.  We have a contract in

17    place.  And the answer to that is, yes, everybody acknowledges

18    there was a meeting about that you couldn't do that.  And

19    afterwards we were the low bidder anyway in terms of real

20    contractors.                                              04:11PM

21         THE COURT:  Qualified bidders.  No.  I'm laughing at

22    the irony of it.  I'm not questioning what you are saying.

23         MR. ALLWEISS:  You know what?  I have to agree with

24    you.  It's pretty ironic.  And what's more ironic is how we

25    have been mischaracterized throughout this entire proceeding   04:12PM

1    about hiding the ball and not disclosing things timely.  The

2    entire record here shows that it was PetsMart that behaved

3    poorly.  We had a contract that was breached.

4            THE COURT:  Okay.  I understand that.  You have

5    answered my question.                                        04:12PM

6            There aren't any Arizona cases on that, are there, Mr.

7    Sturr?

8            MR. STURR:  Yes, there is.  There is a case that

9    addresses this issue.

10           THE COURT:  What case is it?  From what period?       04:12PM

11           MR. ALLWEISS:  Fairly recently, like within the

12   last --

13           MR. STURR:  Arizona Court of Appeals opinion.  I don't

14   have the citation.

15           MR. ALLWEISS:  We can get the cite to you, Judge.     04:12PM

16           THE COURT:  That's why I don't know.  I read all the

17   Arizona appellate cases for 30 years, but I don't read them

18   anymore.  I can't even read the Ninth Circuit opinions.  So

19   that's new law.  Never ran across that.  But it makes sense

20   because it's reading all the clauses together with the covenant  04:13PM

21   of good faith and fair dealing.

22           So anyway, that's not an opinion.  That's just

23   musings.  So let me ask you both to suggest a time to set for

24   Motions For Summary Judgment.

25           MR. ALLWEISS:  Well, the one question I have          04:13PM

1    obviously, Judge, based on what you have ruled from the bench

2    we want to file a Motion For Reconsideration.

3            THE COURT:  I am not interested in a Motion For

4    Reconsideration.  We are moving forward.  I can't prohibit you

5    from filing a Motion For Reconsideration but I don't have to          04:13PM

6    call for a response.  So I'm setting a schedule.  How much time

7    do each of you -- how much time do you want for your motions?

8    You know, frankly, your motions are on different issues,

9    different points.  So we might do simultaneous motions.  I

10   usually don't like simultaneous motions because there's usually      04:14PM

11   some overlap.

12           MS. ANDRESEN:  I think there will be quite a bit of

13   overlap.  I think our position is going to be that the law on

14   termination for convenience is different than --

15           THE COURT:  I know, but I'm talking about your issue's        04:14PM

16   about contract interpretation, his issues about termination for

17   convenience, are they going to overlap?

18           MS. ANDRESEN:  Yes.

19           THE COURT:  Who wants to file the first motion?  I

20   don't care.  I don't want to have simultaneous motions.  You          04:14PM

21   know, maybe, Ms. Andresen, maybe you should go first on the

22   theory that you are going to be attacking the general structure

23   of the contract, what it means, and they are going to be

24   counter-attacking on a specific term.  So maybe that's a more

25   practical way to proceed.  Anybody disagree with that?               04:15PM

1          MS. ANDRESEN:  I'm happy to go first.

2          THE COURT:  So when do you want to file that motion?

3          MS. ANDRESEN:  The end of next month.  Sometime mid to

4     latter half of next month.

5          THE COURT:  End of August.  So how about, well,                04:15PM

6     Friday, August 28.

7          MS. ANDRESEN:  That works, Your Honor.

8          THE COURT:  And how much time do the plaintiffs want

9     to do -- it will be your response and cross motion.  It would

10    be 33 days under our rules unless you want to change that.          04:15PM

11         MR. STURR:  Standard time, Your Honor.

12         THE COURT:  Are you thinking, or -- I'm asking how

13    much time do you want?  You will get their motion on Friday,

14    August 28th.

15         MR. STURR:  Forgive me, Your Honor.  I said the            04:17PM

16    standard time would be fine.

17         THE COURT:  Tell you what.  We don't need to set a

18    schedule.  It is ordered that the defendant's Motion for

19    Summary Judgment is due by August 28 and response and cross

20    motions in accordance with the local rules.                        04:17PM

21         So Ms. Andresen, sounds like their theory, under their

22    theory, if they win on that point, doesn't matter what the

23    contract means, right?  They would win, even if we construed

24    the contract generally your way, if they are right about what

25    this kind of a clause means, they win.  You don't have to admit   04:17PM

1    anything, but I'm just thinking through how this would play

2    out.

3              MS. ANDRESEN:  They would win and then the issue would

4    be damages because I think there's a dispute over what they

5    think the contract price was versus what we think it was.          04:18PM

6              THE COURT:  And it is coming back to me now.  We

7    discussed this at the Rule 11 -- Rule 16.

8              MR. STURR:  Rule 16.  There hasn't been Rule 11.

9              THE COURT:  Rule 11 is a big rule in the criminal

10   rules, too.  Rule 16.  This isn't a ruling it's just an          04:18PM

11   observation that it struck me the time that this deferred

12   payment theory damages was inconsistent with seeking lost

13   profits for the future.  But don't -- as I think I told you

14   back then I scare lawyers by saying things off the top of my

15   head, and it's not -- it just looked like that could be a        04:18PM

16   problem.  So that I think I was thinking back then that if the

17   plaintiffs win they may have to choose one way or the other.

18   They don't get three and-a-half million as a starting point.

19   If they want to go for more, their starting point is zero.

20             Now, I haven't thought it through.  I remember having   04:19PM

21   that thought way back then.  So you think through what you

22   think is best.

23             All right.  If there's nothing else, then, I fully

24   intended to do the rest of that schedule but in light of this

25   ruling now, we don't have to do the rest of that schedule.       04:19PM

1           So thank you for your time.  The discussion has been

2    helpful.  We'll be adjourned.

3           MS. ANDRESEN:  Thank you, Your Honor.

4           (Proceeding concluded at 4:19 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                              C E R T I F I C A T E

6

7              I, LAURIE A. ADAMS, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10              I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15              DATED at Phoenix, Arizona, this 13th day of July,

16    2017.

17

18                                   s/Laurie A. Adams

19                                   _____
                                     Laurie A. Adams, RMR, CRR

20

21

22

23

24

25