**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CMS Mechanical Services, LLC, | No. CV-15-02040-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| PetSmart, Inc., | |
| Defendant. | |

# Table of Contents

I.   SUMMARY ............................................................................................................ 1

II.  FACTUAL BACKGROUND ................................................................................ 2

   A.   The Parties ..................................................................................................... 2

   B.   The Complete Contract: A Master Agreement and a Statement of Work ............ 3

      1.   The 2011 Master Agreement ................................................................... 3

      2.   Negotiations in 2012 Leading to the Relevant Statement of Work .................... 4

      3.   The Finalized 2013 Statement of Work ..................................................... 6

   C.   CMS Immediately Breaches the Contract, but the Parties Resolve the Dispute
        with Capped Billing Arrangements .................................................................. 8

D. CMS Belatedly Claims It Is Entitled to an Arrearage Above the Capped Billings ...................................................................................................... 11

E. This Action.......................................................................................... 12

III. SUMMARY JUDGMENT STANDARD................................................. 13

IV. ANALYSIS ........................................................................................... 14

A. The parties' original contract consisting of the merged Master Agreement and Statement of Work was valid and enforceable. ............................................... 14

   1. The contract's price terms were clear and unambiguous and CMS breached them. ................................................................................................... 14

   2. The contract may not be modified by extrinsic evidence to say Exhibit C was not binding................................................................................................ 15

   3. The original 60-month term in the Statement of Work was invalid as conflicting with the Master Agreement's termination-for-convenience clause........ 16

B. The parties substituted their fixed-price agreement with two capped-billing arrangements, which were valid because they are undisputed and were fully performed. ................................................................................................. 17

C. PetSmart does not owe CMS for "deferred billings.".......................................... 18

   1. There is no evidence that PetSmart ever agreed to pay for deferred billings in addition to the capped amount each month. .............................................. 18

   2. CMS's deferred-billings invoice is barred because it was itself in breach of contract as untimely and inaccurate. .......................................................... 19

   3. The business circumstances and the parties' course of conduct show that CMS had no reasonable basis to think it was entitled to deferred billings........................ 20

D. The parties did not subsequently orally agree to a fixed 60-month term. ........... 20

   1. There is no evidence of a subsequent oral agreement for a minimum 60-month term. ..................................................................................................... 21

   2. The Statute of Frauds defeats CMS's claims that the parties agreed orally to a 60-month term. ...................................................................................... 21

   3. Promissory estoppel also fails for lack of evidence and because CMS's supposed reliance was unjustifiable. .......................................................... 22

E. Reforming the contract to apply the additional-stores formula to all stores fails because there was no mutual mistake or inequitable conduct....................................... 22

F.   PetSmart acted in good faith in terminating the contract after being asked continually to pay more than the contract required and more than it was willing to pay. ..................................................................................................... 24

G.   The termination-for-convenience clause was reasonable and valid. ................... 25

V.   CONCLUSION ........................................................................................... 26

## I.    SUMMARY

This is a breach of contract action by CMS Mechanical Services, LLC ("CMS") against PetSmart, Inc. ("PetSmart").   CMS provides heating, ventilation, and air-conditioning ("HVAC") services.   The two companies entered into an agreement under which CMS was to provide PetSmart's HVAC maintenance needs for 1,157 of its stores. That agreement consisted of two contracts.   First, a Master Agreement provided general business terms that would govern any specific contract for work.   It included the ability for either party to terminate "for convenience" with thirty days' notice and a requirement that all invoices be "timely and accurately submitted."   Second, a Statement of Work for specific work, which became part of the Master Agreement, contracted for CMS to perform preventative maintenance at 1,157 listed store locations.   The Statement of Work clearly and unambiguously stated the annual cost for each listed store down to the penny. Each month, CMS was to bill for 1/12 of the annual cost, which came to roughly $505,000.   In the event PetSmart wanted additional stores serviced, the Statement of Work provided a formula under which the price for each additional store would be calculated.

CMS contends, contradicting the contract's clear language, that the prices for all stores were intended to be only estimates.   CMS began to bill for every store using the additional-stores formula—breaching the contract.   This billing method resulted in monthly invoices well exceeding $505,000.

PetSmart informed CMS that its invoices were above what PetSmart was willing to pay.   To continue their relationship, the parties agreed to a capped-billing arrangement. CMS would bill, and PetSmart would pay, $525,000 every month for six months.   When CMS later sought to raise this amount for 2015, PetSmart informed CMS that its budget allowed it to pay a maximum of $550,000 per month.   CMS acceded, and the new $550,000 billing cap stayed in place for roughly one year.   A year later, CMS began to send monthly bills for north of $600,000, claiming the bills represented a return to the

normal pricing under the Statement of Work. PetSmart exercised its right to terminate for convenience.

CMS then, for the first time, sent PetSmart a bill for amounts it had "deferred," notwithstanding the agreed billing caps. It asserted it was owed an arrearage of roughly $2.6 million under the additional-stores formula, which it applied to the listed stores as well as additional stores serviced. It never identified any portion of this supposed arrearage in its earlier invoices. Nothing indicates that PetSmart ever agreed to pay for these deferred billings, and PetSmart indeed did not pay them. CMS brought this action seeking to collect the supposed arrearage. Over a year after claiming it was owed $2.6 million and after initiating this litigation, CMS averred that it miscalculated under the formula and is actually owed $3.5 million. It is undisputed that neither of the claimed deferred amounts was based on the original contract as written. They were based on CMS's theory that all charges, including for the itemized stores in Exhibit C, were really owed at the higher formula for additional stores.

On the undisputable dispositive facts, summary judgment will be granted for PetSmart against CMS.

## II.   FACTUAL BACKGROUND

The following facts are construed in the light most favorable to the plaintiff, the nonmoving party.

### A.   The Parties

PetSmart is a "specialty pet retailer and pet service provider with stores throughout the United States." (Doc. 175 at ¶ 1.) It is a Delaware corporation with its principal place of business in Arizona. (Doc. 65 at ¶ 4.)

CMS is "one of the largest [HVAC] service companies in the United States." (Doc. 193 at 2-3, ¶ 2.) It is a single-member limited liability company with its principal place of business in Florida. (Doc. 65 at ¶ 2.) (Its single member is itself an LLC, and that LLC has two members. Without traversing farther, it is enough to say that all involved in CMS are citizens of Florida. Diversity of citizenship exists. *See id.* at ¶ 5.)

## B.  The Complete Contract: A Master Agreement and a Statement of Work

Around 2006, CMS began to perform HVAC services for PetSmart.  (*Id.* at ¶ 7.) PetSmart required its product and service providers to enter into a master provider agreement.   A master provider agreement controls the parties' general business arrangements—for example, by including clauses on warranties and representations, inspection, ownership of work, confidentiality, indemnity, etc. (*See generally* Doc 175-1, Ex. 3.)  A master provider agreement does not itself require any services be provided. Instead, it authorizes the parties to enter into separate contracts, in this case called statements of work.

### 1.  The 2011 Master Agreement

PetSmart and CMS entered into a master provider agreement on April 15, 2011 (the "Master Agreement").  (Doc. 193 at 4, ¶ 5.)  Robert Bull, President of CMS, and Randy Carlin, Vice President of Construction at PetSmart, were the signatories.  (*Id.* at 4, ¶ 6.)  Arizona law governs the contract.  (*Id.* at 13, ¶ 25.)

CMS is the "Provider" under the Master Agreement.  (Doc. 175-1, Ex. 3 at 1.) The "Provider shall perform Services in accordance with [the Master Agreement] and as detailed in any [statement of work]."  (*Id.* at 2.)   Any changes to Services must be mutually agreed to in writing and comport with the Entire Agreement/Amendments provision.  (*Id.*)   That provision is an integration clause and states that the Master Agreement is the complete and final agreement between the parties—it "supersede[s] all other agreements and understandings between the Parties regarding the subject matter of this Agreement."  (*Id.* at 8.)  Further, "All . . . [statements of work] are incorporated into this Agreement in their entirety."  (*Id.* at 7.)

The Master Agreement makes clear that either "party may terminate this Agreement or any [statement of work] for convenience upon thirty (30) day notice to the other party, without further obligation or liability, provided that PetSmart agrees to pay Provider for any unpaid invoices and disbursements incurred by Provider for Services authorized by PetSmart."  (*Id.* at 4.)  Elsewhere, PetSmart agrees to "pay Provider within

a reasonable time or as set forth in the [statement of work] for all timely and accurately submitted invoices." (*Id*.) Finally, the Master Agreement says, "In the event there are any inconsistent, contrary, or conflicting terms contained in the [statement of work] and the Agreement, the Agreement shall control." (*Id*.)

### 2. Negotiations in 2012 Leading to the Relevant Statement of Work

The parties "entered into several statements of work pursuant to the 2011 [Master] Agreement." (Doc. 65 at ¶ 12.) The one relevant to this case came to be in 2013, after a lengthy negotiating period.

In 2012, PetSmart approached CMS to see if the two could reach an agreement on CMS providing HVAC services to PetSmart nationwide. Negotiations ensued and lasted for several months, with various redlined drafts exchanged. (*Id*. at ¶ 14.) Crucial to PetSmart, as CMS's President Bull admits, was a fixed and predictable fee arrangement that would allow it to meet its budgetary goals. (Doc. 163-1, Ex. 1 at 45:10-23.)[1]

Yet Bull also noted that the prices were almost certainly going to fluctuate after CMS completed its surveys of PetSmart's various sites. PetSmart did not then have an "asset list, store count, type of equipment, number, quantity." (*Id*. at 45:24-46:9.) Thus, CMS claims the statement of work the two parties ultimately executed contained only estimates of the cost of services. CMS says those estimates would be effective only "until CMS could perform store surveys and equipment audits," at which point the real costs would become clear. (Doc. 192 at 3.) PetSmart's director of facilities management, responsible in part for the negotiations, seemed to agree, believing that the lack of an "accurate asset listed prevent[ed] [the parties] from clearly knowing out of the gate if the contract pricing up front was accurate with the field conditions." (Doc. 193-2, Ex. 48 at 67:14-17.) Further, he was not aware of any reliable asset list that existed at the time the Statement of Work was negotiated. (*Id*. at 67:22-25.) Brad Wallace, the PetSmart

---

[1] Rather than redacting sensitive portions, the parties stipulated to sealing entire deposition transcripts. The Court should not have allowed that blanket sealing. The Court cites and quotes only from relevant portions that have no obvious confidential material.

facilities manager who perhaps most often negotiated the Statement of Work with CMS, also testified that he expected the prices would adjust as CMS audited the stores during their technicians' initial visits. (Doc. 163-1, Ex. 4 at 94:16-95:7.)

Wallace sat across the table primarily from Tommy Barnes, a Vice President at CMS's sister company, who handled the statement-of-work discussions for CMS. On June 8, 2012, Wallace emailed Barnes to obtain "a very rough approximation of what CMS would charge to manage 100% of [PetSmart's] HVAC maintenance." (Doc. 164, Ex. 13.) Without a comprehensive asset list, creating a final, stable price list was impossible. (Doc. 193 at 18, ¶ 32.) So Barnes provided to Wallace, in October of 2012, an estimated cost summary, which was based on information CMS had obtained in its prior dealings with PetSmart and a list of all PetSmart stores. (Doc. 176-1, Ex. 12; Doc. 193 at 18-19, ¶ 34.)

According to Bull, the October estimate reflected a bid. PetSmart wanted prices, calculated using limited information, to compare CMS and its competitor. (Doc. 163-1, Ex. 1 at 39:4-12.) Bull said, based on his understanding of what the parties had communicated throughout the process, that the price per store was always understood to be flexible. (*See id.* at 40:2-41:1.) Before the parties signed the contract, according to Bull, the fact that the listed prices were based on estimates was repeatedly confirmed orally. (*Id.* at 51:23-52:11.)

CMS sent to PetSmart a draft statement of work in November, and the parties exchanged drafts for several months. (Doc. 193 at 24-25, ¶¶ 44-45.) According to a later email from Barnes, "The original site list priced out at $505,883.66 [per month] (6.070m [per year]) with a blend of both known and intelligently calculated unknown equipment counts and capacities of 1,157 active locations." (Doc. 175-1, Ex. 6.) In other words, CMS initially expected to bill, and PetSmart expected to pay, roughly $505,000 per month. In one of CMS's redlined drafts, sent on February 11, 2013, it removed language that said prices per store would be determined once CMS had completed its audits. (Doc. 177-1, Ex. 23; Doc. 178-1, Ex. 24 at 7.)

One sticking point was a proposed early termination penalty. The initial draft from CMS proposed a fee if PetSmart terminated prior to the end of the five-year term. (Doc. 193 at 32-33, ¶ 55.) PetSmart rejected the clause. (*Id.* at 34, ¶ 56.) In the February 11, 2013 discussion draft, CMS had inserted a termination fee provision. (Doc. 178-1, Ex. 24; Doc. 163-1, Ex. 2 at 217:18-218:7.)[2] That provision was rejected and not included in the final product.

PetSmart sent CMS an execution copy of the contract on March 12, 2013. (Doc. 193 at 37, ¶ 60.) CMS compared the drafts and reviewed the final copy for changes. (*Id.* at 38, ¶ 62.)

These details of prior negotiations are recited because CMS contends they matter. But they did not matter once the parties entered into a clear, unambiguous written contract that prescribed prices to the penny, with an express integration clause. CMS had negotiated over various terms that PetSmart did not agree to, including a penalty for termination before 60 months. The Master Agreement still said either party could terminate for convenience.

### 3.    The Finalized 2013 Statement of Work

PetSmart and CMS executed a statement of work on April 1, 2013 (the "Statement of Work"). (Doc. 175-1, Ex. 5 at 3.) The Statement of Work refers to the April 15, 2011 Master Agreement and states that the two documents "contain the entire agreement between the Parties relative to this Statement of Work and supersede all prior agreements, letters, and/or representations, whether written or oral." (*Id.* at 1.) It further reiterates what is contained in the Master Agreement: "In the event there is a conflict between the [Master] Agreement and this Statement of Work [ ], the Agreement shall govern." (*Id.* It says this again before the signature block.) The Statement of Work says the term is

---

[2] CMS repeatedly objects in its Controverting Statement of Facts (Doc. 193) that PetSmart fails to authenticate various emails it submits as evidence. Without more, this objection is inappropriate on summary judgment. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible at trial*." (emphasis added)). PetSmart's agents would be able to authenticate these emails, and render them admissible, at trial.

"sixty (60) months . . . to commence on the Execution Date," after which the Statement of Work continues on a month-to-month basis "until terminated by either party" after the 60-month term. (*Id*.) The Statement of Work also says, "No changes to the fees and rates shall be effective unless such changes are made in writing and signed off by an authorized representative of both Parties." (*Id*.)

Under the Statement of Work, CMS was to provide preventative maintenance and full-service repair for PetSmart's HVAC and energy management services "at specified store locations [ ] upon request from PetSmart." (*Id*.) PetSmart expressly made "no representation or commitment as to the number of [stores] to be serviced by" CMS and "reserve[d] the right to remove a [s]tore in its sole and absolute discretion," so long as it provided prompt notice. (*Id*.)

The scope of the work is described in Exhibit A. (*Id*.) Exhibit A defines preventative maintenance and says that services other than preventative maintenance require separate work orders. (*Id*. at 4.) Exhibit A also details the general invoicing arrangement. CMS was to send an invoice to PetSmart each month. (*Id*. at 7.) "The monthly cost of the [preventative maintenance] is the total of the [preventative maintenance] (Annual Cost Per Location) in Exhibit C and any additional [s]tore locations that have been added as mutually agreed upon in writing. Each month represents 8.33% of the total program cost." (*Id*. Note that 8.33% is 1/12.)

Exhibit C lists 1,157 stores that CMS was to service under the Statement of Work. (*See id*. at 10-35.) It also lists the "Annual Cost Per Location" for each store. If PetSmart requested preventative maintenance at a store not listed in Exhibit C, the annual cost for such a store was to be "calculated at the higher of $681.82 per [roof top unit] or $62.55 per ton." (*Id*. at 7.) Further, CMS was to "provide the Services described [ ] for each Store at the applicable fees and rates, as set forth in Exhibit C. No changes to the fees and rates [were] effective unless such changes [were] made in writing and signed off by an authorized representative of both Parties." (*Id*. at 1.) If the number of stores in

Exhibit C changed by 10% or more, the parties agreed that "the pricing may be adjusted by mutual written agreement." (*Id.* at 7.)

In summary, the Statement of Work had clear terms. It contained two different methods of determining what CMS was to bill PetSmart. Exhibit C was a table labeled "Pricing." In that table, each store had an exact annual maintenance price down to the penny. They are exact prices. No formula appears in Exhibit C. Nor does any language indicate anything is an estimate. Each month, CMS was to bill for 8.33% of the annual cost, which worked out to roughly $505,000 per month. In the event PetSmart requested CMS to perform services "at a Store location not specified in Exhibit C, or as otherwise set forth in writing between the parties," a variable formula, based on average age and tonnage, applied for those stores. (*Id.*)

### C. CMS Immediately Breaches the Contract, but the Parties Resolve the Dispute with Capped Billing Arrangements

CMS began work pursuant to the Statement of Work in April 2013. Despite the clear language of Exhibit C, by the second month CMS began charging more than $505,000 per month. CMS explains that it was "conducting site survey and equipment audits, resulting in updated unit and tonnage counts." (Doc. 192 at 3.) It then "applied the pricing formula to the new data" (*id.*), resulting in it charging more than Exhibit C authorized.

CMS was unable to visit/service all of the stores in April and thus sent PetSmart a bill for only $390,227.55. (Doc. 193, Exs. 69, 70.) The next month, however, it sent a bill for $646,939.30. (*Id.*, Ex. 71.) This was, CMS says, the result of servicing additional locations that it had not reached in April and of conducting surveys and equipment audits that resulted in an upward adjustment in total price for the month. (Doc. 193 at 74, ¶ 20; Exs. 72, 73, 74.) But in fact the total price could not increase from surveys and equipment audits concerning any store listed in Exhibit C. It could increase only if there were additional stores not in Exhibit C and only by the exact amount of the formula for additional stores. The June 2013 invoice was for $567,199.01. (Doc. 181-1, Ex. 32.)

Although PetSmart paid all three invoices, it immediately became worried it was paying more than it had agreed to. On May 15, 2013, Joseph Duncan, a capital improvement project manager at PetSmart, sent Wallace an email wondering why the amount was so high: "I thought it was supposed to be 550k or so?[3] Something seems amiss!" (Doc. 181-1, Ex. 40.) Barnes said he would get back to him but believed it was a reconciliation from April's low bill. Duncan "thought the billing would change" only if the store count changed by ten percent. Barnes responded, "The initial price was based on average, to be confirmed when we had accurate equipment lists and counts for the sites we did not know. Once done, then the price if [*sic*] fixed and stays the same for the duration, and gets revisited when the store counts change by 10%." (*Id.*) That may be what CMS had hoped for, but it is not what the Statement of Work says or what PetSmart agreed to in writing.

A June 10, 2013 email from Wallace to Bull and Barnes indicates that Wallace believed the parties had negotiated for $6.1 million in parts and labor annually. (Doc. 182-1, Ex. 41.) The sum of the different store prices listed in Exhibit C totals roughly $6.1 million—which, as discussed, works out to about $505,000 per month. As Wallace put it, "Contract language aside, you [Barnes] and I both knew that was the program from [PetSmart's] eyes, and you felt CMS could provide that." (*Id.*) PetSmart made clear that it could not and would not pay the higher amounts CMS was billing (perhaps not even knowing that CMS's billings were higher because they were in direct breach of the price terms of the contract).

As things stood then, the incipient relationship was ripe for 30-day termination by either party, as both were dissatisfied. PetSmart was dissatisfied because it was being charged more than it agreed to pay or would pay, and CMS was dissatisfied because it wanted more than the contract provided.

But in an effort to continue doing business, the parties agreed to a capped billing amount of $525,000 per month from July 2013 through the end of that year. (Doc. 193 at

---

[3] All evidence indicates that Duncan meant 505k, not 550k.

52, ¶ 81.) CMS invoiced for the capped amount, and PetSmart paid each month. In September 2013, CMS sent a projection for the following year that exceeded $7 million in parts and labor. (*See* Doc. 182-1, Ex. 42.) Wallace noted that this was too expensive to conform to his budget, which was due in nine days, and was in fact higher than what PetSmart would be spending to manage its HVAC service with ad hoc vendors. He thus explained that PetSmart might need to look elsewhere for its HVAC servicing: "Gentlemen, I fear we may have done all that we can to make this work." (*Id*.)

PetSmart determined that it would be able to pay $550,000 per month in 2014, and Wallace proposed that CMS adjust some of its preventative maintenance or filter service to hit that number. (Doc. 193, Ex. 80.) CMS agreed, with the caveat that adding or removing stores would change the price accordingly. (Doc. 193, Ex. 85.) An email from Barnes to Duncan says, "The discount was granted with consideration of the program duration to its full term." (*Id*.) PetSmart did not confirm that, as it had not confirmed other things CMS had negotiated for. Again, the parties did not formally modify the Statement of Work in writing, but CMS increased its invoices from $525,000 to just shy of $550,000 from February 2014 through January 2015. PetSmart paid the invoices.

On August 21, 2014, Wallace sent Barnes an email that stated he was "being aggressively pushed to keep the $550k/month plus new store growth static." (Doc. 193, Ex. 86.) He wanted to know what needed to happen "to keep the contract + new store growth [at] $550k/month in 2015." (*Id*.) Apparently things became tense, as an email from Barnes to Bull on September 12, 2014, shows CMS *itself* believed termination on its end was in play: "[L]ooks like we give 30 day notice and we are out with where we stand. The 'Master Provider Agreement' trumps the 'Statement of Work' in wording conflicts." (Doc. 180-1, Ex. 27.) Later, Barnes emailed Wallace and indicated that CMS had come close to being able to continue working at the $550,000 capped rate. (Doc. 193, Ex. 87.) Both sides thus expressed their awareness that they could end their business relationship on 30 days' notice. These mutual expressions came after the time that CMS later contended PetSmart had agreed to make the 60-month term binding.

### D. CMS Belatedly Claims It Is Entitled to an Arrearage Above the Capped Billings

In October 2014, PetSmart informed CMS that it was seeking new bids for the services that CMS was performing.  (Doc. 193 at 54, ¶ 84.)  CMS could rebid and if successful, it would have a new and different contract.  Obviously, if someone else got the new contract, CMS's contract would be terminated on 30 days' notice.  CMS participated in the re-bidding process.  (*Id.* at 78, ¶ 38.)  According to CMS, as part of that rebidding process, Barnes attended a November 2014 meeting with Carlin, PetSmart's Senior Vice President of Real Estate and Development (and signer of the Master Agreement).  (*Id.* at 78-79, ¶ 39.)  During the meeting, Barnes asked if it was an appropriate time to discuss the deferred bills.  (*Id.* at 79, ¶ 40.)  One of PetSmart's officers supposedly acknowledged that CMS was owed an arrearage, and Carlin became upset and left the room.  (*Id.*)

On February 25, 2015, Barnes sent to PetSmart a proposed amendment to the Master Agreement that would have made the Statement of Work not terminable until March 31, 2018, five years after its April 1, 2013 execution date.  (Doc. 180-1, Ex. 28.)  Barnes's cover letter stated that the purpose of the amendment was "primarily to affirm the Parties' specific intent to create a fixed five-year term under the" Statement of Work. (*Id.*)  The letter also stated the following: "CMS is willing to forego the revenue it earned and agreed to defer as an accommodation to PetSmart during the first two years of the [Statement of Work], in order to conclude the process expeditiously."  (*Id.*)  Thus, the undisputed oral modifications for a monthly cap in 2013 and a higher cap in 2014 were fully performed.  In the meantime, CMS continued to perform under the Statement of Work and to submit invoices to PetSmart, which were approximately $607,000 per month from February through May of 2015, in excess of the $550,000 agreed cap for 2014 and in excess of the amounts and rates originally contracted in the Statement of Work.  (Doc. 193 at 57-58, ¶¶ 88-89.)  CMS asserted the adjustment was "merely [a] return[ ] to normal pricing under" the Statement of Work once the $550,000 billing cap had expired.

(*Id.* at 57, ¶ 88.)  The record is not entirely clear whether CMS's February to May 2015 billings were at the correct contractual rate from the original Statement of Work or at CMS's contract-breaching higher rate.  It seems they must have been at CMS's higher rate.  But that does not matter because PetSmart has not counterclaimed for the excess payments in those months.

PetSmart did not accept Barnes's proposal.  According to Barnes, PetSmart "was disappointed that [CMS] did not make the deferment of monies extremely clear during the early discussions."  (Doc. 181-1, Ex. 36.)  It was also clear that "[t]ermination for convenience ha[d] to stay."  (*Id.*)

And indeed, on April 30, 2015, pursuant to the Master Agreement's termination-for-convenience clause, PetSmart sent a 30-day notice of termination.  (Doc. 175-1, Ex. 9.)  CMS responded on May 20, 2015, contesting PetSmart's ability to terminate under the Master Agreement.  (Doc. 175-1, Ex. 10.)  It demanded, for the first time, payment in full of its "deferred billings," which it calculated as the difference between (1) the cost of parts and labor under the Statement of Work's additional-stores formula and (2) the invoiced amounts actually sent to PetSmart under the $525,000 and $550,000 monthly caps.  CMS's demand for deferred billings for previous work done, billed, and paid for was calculated based on the same pricing formula in breach of the original contract that CMS had employed before the parties agreed on billing caps.  The sum of all the monthly differences was $2,604,151.96 by CMS's calculation at the time it responded to PetSmart's termination notice.  (*Id.*)  Over a year later, after filing this lawsuit, CMS averred that it miscalculated and is actually owed $3,491,406.96.  (Doc. 61 at ¶¶ 51-52.)  Again, none of those amounts had been invoiced to PetSmart in the manner the Master Agreement required, and all the amounts invoiced had been paid.

### E.    This Action

On October 12, 2015, CMS filed this action.  It filed its second amended and operative Complaint on October 13, 2016.  It pleads four counts: Count I: Breach of Contract for Purported Termination of the Statement of Work; Count II: Alternative

Breach of Contract for Failure to Pay for Work Performed; Count III: Breach of the Covenant of Good Faith and Fair Dealing; and Count IV: Alternative to Breach of Contract via Promissory Estoppel.  (Doc. 61 at 9-12.)  PetSmart moves for summary judgment on all counts.

### III.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial.  Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings.  *Anderson*, 477 U.S. at 256.  To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Id.* at 587.  "A court must view the evidence 'in the light most favorable to the [non-moving] party.'"  *Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson*, 477 U.S. at 249).

# IV. ANALYSIS

## A. The parties' original contract consisting of the merged Master Agreement and Statement of Work was valid and enforceable.

### 1. The contract's price terms were clear and unambiguous and CMS breached them.

"The interpretation of a contract is generally a matter of law." *Powell v. Washburn*, 211 Ariz. 553, 555, 125 P.3d 373, 376 (2006). "[W]hen one [party] agrees to perform in a certain manner upon adequate consideration and fails to keep the agreement, [it] is liable to the performing party for any damages sustained as a result of [the] failure to perform." *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975). "[T]he plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." *Id.*

There is no doubt that a contract existed in this case. The plain language of that contract, consisting of the merged Master Agreement and Statement of Work, authorized services for fixed prices at 1,157 stores, with a formula that was to apply if additional stores were serviced.

CMS immediately breached the contract by applying the additional-stores formula to all of the stores it serviced. The contract explicitly states the "monthly cost of the [preventative maintenance] is the total of the [preventative maintenance] (Annual Cost Per Location) in Exhibit C and any additional Store locations that have been added as mutually agreed upon in writing." (Doc. 175-1, Ex. 5 at 7.) The "Annual Cost Per Location" is what appears in Exhibit C, above the column in which each store's exact annual maintenance price appears. (*See id.* at 10.) Further, the labor rates (standard, overtime, and holiday) listed in Exhibit C next to the prices are not surplusage; the Statement of Work says that other services not covered by the definition of preventative maintenance will be billed at those rates. (*See id.* at 7.) Finally, the Statement of Work contemplates a formula to be used in the event "PetSmart requests [CMS] perform Services at a Store location not specified in Exhibit C." (*Id.*) That formula itself twice mentions that it applies to an "additional Store location." (*Id.*) The only possible reading

of Exhibit C is that it sets exact prices that PetSmart agreed to pay for specific services that CMS provided. To find otherwise would do violence to the clear language of the contract and write Exhibit C out of the contract entirely.

### 2. The contract may not be modified by extrinsic evidence to say Exhibit C was not binding.

Faced with clear contract language that is fatal to its claim, CMS wishes to offer extrinsic evidence to demonstrate that the parties understood at the time of contracting "that Exhibit C was a placeholder." (Doc. 192 at 9.) In other words, Exhibit C was meant to represent only an estimate and the additional-stores formula was supposed to govern *every* store's price.

First, CMS's "placeholder" theory is not plausible. It would mean that Exhibit C was not binding and did not mean anything. In other words, the contract was missing an essential element: a price term. To supply the supposed empty price term for the 1,157 stores, CMS does double violence to the price formula for additional stores. It says, in defiance of the additional-stores language, that the formula applies to the 1,157 stores listed in Exhibit C, not just what it says it applies to—the additional stores. CMS urges the Court to examine particular components of the parties' negotiations to conclude that Exhibit C was an estimate. But CMS asked for many things (including a termination penalty) that it did not get out of the negotiations in the contract. The negotiations do not matter; the final contract does.

Bolstering that point is the fact that the contract contains an integration clause. (Doc. 175-1, Ex. 3 at 8.) The clause says it "supersede[s] all other agreements and understandings between the Parties regarding the subject matter of this Agreement." (*Id.*) There is no way to introduce evidence of the negotiations without running afoul of that bargained-for term.

Finally, the parol evidence rule precludes CMS's proffered extrinsic evidence. "The court must decide what evidence, other than the writing, is admissible in the interpretation process, bearing in mind that the parol evidence rule prohibits extrinsic evidence to vary or contradict, but not to interpret, the agreement." *Taylor v. State Farm*

*Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993). "[T]he proper analysis has two steps. First, the court *considers* the evidence that is alleged to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent. The court's function at this stage is to eliminate the evidence that has no probative value in determining the parties' intent." *Id.* at 153, 854 P.2d at 1139 (internal citation omitted). Then the court turns to the second step, which is finalizing its "understanding of the contract. Here, the parol evidence rule applies and *precludes admission* of the extrinsic evidence that would vary or contradict the meaning of the written words." *Id.* (emphasis in original) (internal citation omitted). The inquiry is ultimately whether the contract is "reasonably susceptible" to the proffered interpretation. *Id.* at 154, 854 P.2d at 1140.

At step one of the *Taylor* analysis, the Court has examined all of the evidence recounted above. But Arizona's parol evidence rule excludes CMS's proffered evidence. Exhibit C specifies exact prices for each store down to the penny and indicates nowhere that anything is an estimate. It is "reasonably susceptible" only to one interpretation: a list of separate stores, each of which is paired with an exact price, and new stores at an exact formula. The parol evidence rule also precludes reading the additional-stores formula to say it applies to all stores.

> ### 3. The original 60-month term in the Statement of Work was invalid as conflicting with the Master Agreement's termination-for-convenience clause.

CMS's final argument regarding the original contract is that the 60-month term in the Statement of Work has meaning only if it runs its entire duration. Thus, PetSmart could not terminate prior to the end of the 60 months.

The Master Agreement and the Statement of Work must be read together as one contract. (*See* Doc. 175-1, Ex. 5 at 1 ("This Statement of Work is entered into and forms a part of the Master [ ] Agreement.").) Both documents acknowledge that the Master Agreement controls in the event of a conflict.

The Statement of Work provides that its duration is 60 months. (*Id*.) It further states that "[u]pon expiration of the Term, this [Statement of Work] will continue to be in effect on a month-to-month basis until terminated by either Party." (*Id*.) The Master Agreement, on the other hand, provides for termination for convenience of both the Master Agreement and "any" statement of work. (Doc. 175-1, Ex. 3 at 4.)

There is an inherent conflict between termination on 30 days' notice for convenience and termination only after 60 months. The Master Agreement therefore controls. Because the Master Agreement allows for termination for convenience for both the Master Agreement and the Statement of Work, termination for convenience trumps any defined service period in a Statement of Work. The evidence is that both parties acknowledged the contract was terminable for convenience, notwithstanding the apparent 60-month term in the Statement of Work. CMS is wrong in contending that PetSmart could not terminate prior to the end of the 60-month term. That was the effect and meaning of the binding contract terms at the commencement of the contract.

**B.     The parties substituted their fixed-price agreement with two capped-billing arrangements, which were valid because they are undisputed and were fully performed.**

Due to its overbilling, CMS was in breach of the original contract. According to the Master Agreement's termination-for-convenience provision, if either party was unhappy, it could walk away with 30 days' notice. That was the entire point of the provision. CMS knew that just as well as PetSmart. Recall that in Barnes's September 12, 2014 email to Bull, long after the mutual agreement to continue under billing caps was made, he noted that CMS still had that right (and therefore PetSmart did too): "[L]ooks like we give 30 day notice and we are out with where we stand. The 'Master Provider Agreement' trumps the 'Statement of Work' in wording conflicts." (Doc. 180-1, Ex. 27.)

But the parties, wanting to continue their relationship, went a different way and modified part of their agreement. PetSmart said it was willing to pay a capped amount of $525,000 per month. CMS agreed to invoice PetSmart for that amount. Later, for 2014,

the parties increased the billing cap to $550,000. The Master Agreement requires all modifications to be in writing, but the parties performed under these separate capped-billing agreements through January 2015, when they expired.

The parties' undisputed oral agreement, demonstrated by their course of performance, was they agreed to a billing cap of $525,000 through most of 2013 and $550,000 in 2014. There is absolutely no evidence that PetSmart ever agreed to anything other than these specific terms. It is undisputed the parties thus modified the contract, CMS submitted invoices accordingly, and PetSmart paid those invoices.

### C.     PetSmart does not owe CMS for "deferred billings."

PetSmart repeatedly informed CMS that it faced budgetary constraints and would pay no more than $525,000, later $550,000, per month. Both caps were more than the $505,000 per month it had originally contracted for. When the $550,000 billing cap expired in about January 2015, CMS billed PetSmart higher amounts under CMS's (erroneous) view that it was owed for all stores under the additional-stores formula in the original Statement of Work. PetSmart terminated under the Master Agreement's termination provision as it said it would. CMS then invoiced PetSmart, for the first time, for "deferred billings" of $2,604,151.96.

#### 1.     There is no evidence that PetSmart ever agreed to pay for deferred billings in addition to the capped amount each month.

CMS's claim for deferred billings is that PetSmart agreed that it would have to pay more later for the services that were mutually capped. It offers no actual evidence that anyone at PetSmart ever said at the time of making the new oral agreement it would owe for later billings above the capped amounts. Any implication that PetSmart had that understanding is precluded by the consistent undisputed communications that PetSmart would not pay more than the capped amounts. The interaction in November 2014 in which PetSmart's Vice President of Construction became upset and left the room when Barnes said additional money was owed for past services is not evidence of a meeting of the minds on the deferred billings at the time of contracting. It is evidence to the contrary. Any implication that PetSmart would pay later the full amount of what CMS

1   mistakenly claimed under Statement of Work is contradictory to what admittedly was
2   said.  Indeed, PetSmart told CMS, prior to the $550,000 cap, that it would be less
3   expensive to use ad hoc vendors for its HVAC servicing needs.  (Doc. 182-1, Ex. 42.)  As
4   elaborated below, it would be utterly nonsensical to construe this as an understanding that
5   CMS could run up millions of dollars in more disputed charges.  PetSmart did not agree
6   to fly higher and longer and jump out of an airplane to test its parachute.  It grounded the
7   flight so no parachute was necessary.

### 2. CMS's deferred-billings invoice is barred because it was itself in breach of contract as untimely and inaccurate.

10  The Master Agreement requires "timely and accurately submitted invoices."
11  (Doc. 175-1, Ex. 3 at 4.)  It also includes a time-is-of-the-essence clause.  (*Id.* at 8.)  The
12  prejudice in CMS's tardiness is obvious: PetSmart could have terminated and avoided
13  exactly what CMS is trying to do now, running up millions of dollars of extra charges on
14  top of the agreed capped billings.   Barnes testified that he sent a spreadsheet in
15  September 2013 with accrued deferred amounts (Doc. 193 at 61, ¶ 93.), but that was not
16  an invoice.  It was more negotiation for what CMS would like and did not have.
17  PetSmart reiterated its continued budget constraints and asked CMS to continue at the
18  capped rate.  (Doc. 163-1, Ex. 2 at 265:17-20.)  Bull admitted that the timely invoices
19  CMS submitted never showed these deferred amounts or that any billings were being
20  "deferred."  (Doc. 164, Ex. 11 at 107:18-109:1.)

21      Only after PetSmart terminated the contract in April 2015 did CMS send an
22  invoice reflecting these deferred billings.  This post-termination invoice was untimely
23  under the Master Agreement and is independently barred for that reason.  Further, CMS's
24  deferred billings were above the original valid contracted rate.  The deferred billings were
25  at the breach-of-contract rate CMS had originally charged and for which it now seeks
26  reformation.   That was not an "accurate" invoice, even if somehow more could be
27  claimed.  PetSmart agreed only to pay the original contract price (roughly $505,000 per
28  month) and the subsequent billing caps ($525,000 and $550,000).

3. **The business circumstances and the parties' course of conduct show that CMS had no reasonable basis to think it was entitled to deferred billings.**

The very point of the undisputed mutual agreement to continue work under the monthly cap was to avoid fighting about what the agreed formula meant and give PetSmart the budget certainty it wanted at a price it could and would pay. The alternative was for PetSmart to cut its losses on CMS and terminate, paying for all work done. It would be unreasonable, indeed irrational, for PetSmart to "solve" its problem by deferring to years later a reckoning on how many millions more dollars it owes, running up the count throughout, when it could simply terminate and avoid that risk and any other risk of further dealings with CMS. As PetSmart made clear, it could have contracted locally for less than the amounts CMS was claiming. CMS also had the option to terminate if it decided the work at that capped rate was undesirable. In these circumstances, no rational person could conclude what CMS contends: that the capped monthly fee modification was not capped at all and included an implied term that much more in unknown amounts could be invoiced and would be owed later. One hesitates to use strong language, but it is not too strong to say that is ridiculous.

D. **The parties did not subsequently orally agree to a fixed 60-month term.**

CMS also claims that the Statement of Work's 60-month term, though invalid at the start as explained above, was revivified by a later oral agreement. PetSmart supposedly promised CMS that if CMS billed less each month than the amounts due under CMS's view of the Statement of Work, then PetSmart would not terminate the Statement of Work prior to the first five years. (Doc. 61 at ¶ 84.) This separate oral modification supposedly created a new binding obligation not to terminate before 60 months. Further, according to CMS, "It was reasonably foreseeable to PetSmart that CMS would rely on that promise," and "CMS justifiably relied on that promise, reducing its monthly invoices by amounts totaling $3,491,406.96." (*Id.* at ¶¶ 85-86.) CMS also seeks relief under the doctrine of promissory estoppel.

1          **1.     There is no evidence of a subsequent oral agreement for a**
2               **minimum 60-month term.**

3          There is no evidentiary support for a subsequent oral contract for a guaranteed

4    minimum 60-month term.  CMS offers an email from Barnes to Duncan in September

5    2013 saying CMS considered the $550,000 cap for 2014 a "discount."  Barnes wrote,

6    "The discount was granted with consideration of the program duration to its full term."

7    (Doc. 193, Ex. 85.)  That was mere negotiation as confirmed by Barnes's later February

8    25, 2015 email requesting an amendment to the Master Agreement to make mandatory

9    the 60-month term—an attempt PetSmart rejected.  (Doc. 180-1, Ex. 28; Doc. 181-1, Ex.

10   36.)  There is no evidence or rational inference that PetSmart agreed to that term.  The

11   claim fails on this basis alone.

12         **2.     The Statute of Frauds defeats CMS's claims that the parties**
              **agreed orally to a 60-month term.**

13         Arizona's Statute of Frauds also bars CMS's claim of later oral contract.  A.R.S.

14   § 44-101(5) provides as follows: "No action shall be brought in any court in the

15   following cases unless the promise or agreement upon which the action is brought, or

16   some memorandum thereof, is in writing and signed by the party to be charged . . . [u]pon

17   an agreement which is not to be performed within one year from the making thereof."  It

18   would be impossible to perform a 60-month contract within one year.  The Statute of

19   Frauds bars this contested agreement.

20         CMS argues that the 60-month term is, in fact, in writing in the Statement of

21   Work.  (Doc. 192 at 16-17.)  The Court has already explained that the original 60-month

22   term in the Statement of Work was invalidated by the Master Agreement.  CMS has to

23   have obtained a later valid contract.  CMS contends a later contract was created when the

24   parties agreed in June 2013 to monthly billing caps.  "PetSmart promised to adhere to

25   CMS's understanding of the contract's five-year term, which PetSmart disagreed with, in

26   exchange for CMS capping invoices temporarily."  (*Id.* at 16 (emphasis removed).)

27   Whether that was a new contract or a modification, that term needed to be in writing and

28   signed by the party to be charged.

### 3. Promissory estoppel also fails for lack of evidence and because CMS's supposed reliance was unjustifiable.

"To prove promissory estoppel, [the plaintiff] must show that the defendant[ ] made a promise and should have reasonably foreseen that [the plaintiff] would rely on that promise." *Higginbottom v. State*, 203 Ariz. 139, 144, 51 P.3d 972, 977 (Ct. App. 2002).

This too fails, first because there is no evidence of such an agreement by PetSmart, as shown above.

Second, reliance must be reasonable for promissory estoppel to apply. With narrow exceptions not applicable here, it is unjustifiable to rely on an oral promise when the Statute of Frauds requires that a contract on the same terms be in writing. *See Trollope v. Koerner*, 106 Ariz. 10, 18, 470 P.2d 91, 99 (1970) (noting, in a case involving a five-year lease, that "a finding of justifiable reliance under the facts of this case would frustrate the basic policy and effect of the [relevant] subsection of the Statute of Frauds"). CMS's promissory estoppel claim fails.

### E. Reforming the contract to apply the additional-stores formula to all stores fails because there was no mutual mistake or inequitable conduct.

Reformation is the last hope of desperate lawsuits, and so it is here. If all else fails, CMS asks for reformation to delete the 25-page Exhibit C and make the separate compensation formula for additional stores apply to all stores.

"[R]eformation is a remedy designed to correct a written instrument that fails to express the terms of an agreement reached by the parties due to a mutual mistake of fact." *Thurston v. Citizens Utilities Co.*, No. CIV 91-1857 PHX CAM, 1995 WL 152713, at *4 (D. Ariz. Feb. 16, 1995) (citing *Isaak v. Mass. Indem. Life Ins. Co.*, 127 Ariz. 581, 584, 623 P.2d 11, 14 (1981)). "A party seeking reformation of a written agreement must show that a definite intention on which the minds of the parties had met pre-existed the written instrument and that the mistake occurred in its execution." *SWC Baseline & Crimson Inv'rs, L.L.C. v. Augusta Ranch Ltd. P'ship*, 228 Ariz. 271, 279, 265 P.3d 1070, 1078 (Ct.

App. 2011) (internal quotation marks and modification omitted). "In the absence of mutual mistake, to reform an instrument because of the unilateral mistake of one party, there must be fraud or inequitable conduct by the other party." *Isaak*, 127 Ariz. at 584, 623 P.2d at 14.

"Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154." Restatement (Second) of Contracts § 152 (1981); *Emmons v. Superior Court In and For Cty. of Maricopa*, 192 Ariz. 509, 512-13, 968 P.2d 582, 585-86 (Ct. App. 1998). Section 154 states that a "party bears the risk of a mistake when . . . the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." CMS does not seek to void the contract but to enforce it as rewritten.

There is no evidence of mutual mistake here. The parties negotiated for differing terms, and a contract was signed by both parties in the end. PetSmart never agreed with what CMS was asking for and what CMS now says the writing should have said. That is not mutual mistake.

CMS also contends, inconsistently, that each party attached a different meaning to the pricing terms. That has to mean that CMS thought, and reasonably so, that the writing, which it admitted it read before signing, really meant the additional-stores price formula applied to all stores, notwithstanding the Exhibit C list and price terms. Thus, CMS alternatively seeks reformation based on its own unilateral mistake. Any unilateral mistake here would be unreasonable. CMS had a duty to read the contract over which it had been bargaining for months. *Cf. Terry v. Gaslight Square Assocs.*, 182 Ariz. 365, 369, 897 P.2d 667, 671 (Ct. App. 1994) (citing *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 395, 682 P.2d 388, 400 (1984)) (acknowledging that the duty to read is not a rigid doctrine but implying that it applies to "the dickered deal"). CMS concedes it did read the document, comparing drafts and taking over two

weeks to sign the final copy. (Doc. 193 at 38-39, ¶¶ 62-64.) Indeed, this was a short and simple contract of a little over eight pages—sixteen if one also rereads the eight-page Master Agreement.

Even assuming CMS made a reasonable unilateral mistake, its reformation claim still fails because it has no evidence of fraud or inequitable conduct on the part of PetSmart. CMS argues that "PetSmart acted inequitably by, among other things, pressuring CMS into lowering its monthly service invoices by baselessly threatening to terminate." (Doc. 192 at 13.) That has nothing to do with the formation of the original contract. And it was perfectly appropriate for PetSmart to so respond to CMS's billings well above the contract and PetSmart's budget. It was doubly appropriate to do so since PetSmart had the right to solve its problem by walking away from the contract, no questions asked. CMS presents no evidence that PetSmart knew CMS was mistaken and attempted to take advantage of CMS. *See Isaak*, 127 Ariz. at 584, 623 P.2d at 14 ("Inequitable conduct which would justify reformation when there is unilateral mistake takes the form of knowledge on the part of one party of the other's mistake.").

Finally, this whole discussion of reformation has a surreal quality. CMS was promptly told its billings were higher than PetSmart thought correct and higher than PetSmart's budget allowed. At that point both parties had the power of self-help reformation. But rather than terminate, CMS agreed to supersede the price terms with the overriding billing cap. That superseding agreement moots any original dispute over the price terms. (It also precludes the belated claim for millions of dollars in deferred billings.) In no event could the original price term be reformed to apply after the agreements for billing caps.

### F. PetSmart acted in good faith in terminating the contract after being asked continually to pay more than the contract required and more than it was willing to pay.

CMS alleges PetSmart's termination breached the covenant of good faith and fair dealing. (Doc. 61 at ¶¶ 75-79). "A covenant of good faith and fair dealing is implicit in every contract." *Kuehn v. Stanley*, 208 Ariz. 124, 132, 91 P.3d 346, 354 (Ct. App. 2004).

"This covenant requires that neither party act to impair the right of the other to receive the benefits that flow from their agreement or contractual relationship." *Id.* "As a general rule, an implied covenant of good faith and fair dealing cannot directly contradict an express contract term." *Id.* "[T]he relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986). The general rule is that exercising an express contractual right cannot violate the covenant of good faith and fair dealing. *Kuehn*, 208 Ariz. at 132, 91 P.3d at 354.

A discretionary power under a contract may not be exercised in a way that deprives the other party of bargained-for rights. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 491-92 38 P.3d 12, 29-30 (2002). But CMS had no right to its inflated prices, a 60-month binding term, or extra charges after billing and being paid at the agreed caps for a year and a half.

PetSmart acted with *uberimma fides*, agreeing twice to raise the amount above what it was originally willing to pay. It did so despite CMS immediately breaching the original contract and repeatedly asking for price terms beyond what PetSmart was willing to pay. When in 2015 CMS began to bill around $607,000 per month—$100,000 more than had been agreed to in the original contract—PetSmart had yet more reason to terminate.

### G. The termination-for-convenience clause was reasonable and valid.

Although the termination-for-convenience clause is not part of any cause of action, CMS disparages it as somehow abusive. It therefore warrants brief discussion.

The termination-for-convenience clause in the Master Agreement essentially made it close to an at-will contract. It cut off expectation damages, but it assured payment for work already done and 30 days to wind work up. The clause allowed both parties to exit their relationship if it became unsatisfactory. It also capped the losses to both sides from having to continue under unsatisfactory or disputed terms.

CMS argues that "for convenience" has a technical meaning that bound PetSmart whether it knew it or not. (*See* Doc. 192 at 14-15.) That is not how contract law works. "For convenience" clauses historically have been in contracts between the government and private contractors. *Ry-Tan Constr., Inc. v Wash. Elementary Sch. Dist. No. 6*, 208 Ariz. 379, 393, 93 P.3d 1095, 1109 (Ct. App. 2004), *vacated on other grounds*, 210 Ariz. 419, 111 P.3d 1019 (2005). Now the phrase has made its way into private contracts, but there is "very limited authority addressing termination for convenience clauses" in such contracts. *SAK & Assocs., Inc. v. Ferguson Constr., Inc.*, 189 Wash. App. 405, 410, 357 P.3d 671, 674 (Wash. Ct. App. 2015). Regardless, nothing indicates the parties understood and intended to imbue the words with any specialized meaning beyond their plain meaning.

CMS insinuates with generalities that the clause was not valid. (*See* Doc. 61 at ¶¶ 77-78.) Yet CMS points to no public policy that the clause violates. CMS's only Arizona case is *Arizona's Towing Professionals, Inc. v. State*, 196 Ariz. 73, 993 P.2d 1037 (Ct. App. 1999), in which the contract was "cancelable for convenience" with 30 days' notice. *Id.* at 75, 993 P.2d at 1039. The court held the state agency's cancellation was improper because, under the facts of the case, exercising the power to cancel "thwart[ed] administrative or judicial review of [the agency's] decisions." *Id.* at 77, 993 P.2d at 1041. In other words, it violated Arizona public policy. Again, the termination-for-convenience clause in the Master Agreement benefitted both companies at the outset, and its exercise here violated no public policy.

## V. CONCLUSION

The foregoing addresses each of CMS's claims on its own terms. However, it gives a broader perspective on this lawsuit to view it as a whole. The parties negotiated and executed a contract that had pricing terms down to the penny and that totaled to about $505,000 a month. Yet CMS immediately began charging a higher price that, to be valid, would require reformation of the written contract. When PetSmart reiterated that it needed price stability lower than CMS's number, PetSmart could have abandoned this

contract that was unacceptable at CMS's newly discovered price.

Instead, PetSmart conceded to a $525,000 monthly cap, later raised to $550,000, which CMS accepted. Yet CMS now contends, without evidence, that PetSmart got no price stability at all but went forward open to roughly an additional $195,000 for each of the 18 months under the billing "caps." And it did not even have to invoice for those amounts while it did bill and was paid for the agreed capped amounts.

But there is more. CMS says PetSmart also obligated itself to that astounding arrangement for unknown costs for another 57 months after the billing cap agreement in June 2013. This includes the 34 months after the contract was ultimately terminated in April 2015. All that supposedly happened after PetSmart undisputedly told CMS its contract was for $505,000 per month, CMS was charging too much, it could not and would not pay more, and it required price stability. As a whole and in each of its parts, that story beggars credulity. "This law suit is an attempt by the plaintiffs to unjustly enrich themselves at the expense of the defendant [ ]. To attempt to use the law and the courts for this purpose not only brings disrespect to the judiciary, but is also an unwarranted burden on an already congested court system." *Amos Flight Operations, Inc. v. Thunderbird Bank*, 112 Ariz. 263, 268, 540 P.2d 1244, 1249 (1975).

IT IS THEREFORE ORDERED that Defendant PetSmart, Inc.'s Motion for Summary Judgment on the Second Amended Complaint (Doc. 161) is granted.

IT IS FURTHER ORDERED that the clerk enter judgment in favor of Defendant PetSmart, Inc. against Plaintiff CMS Mechanical Services, LLC and that Plaintiff take nothing.

The clerk shall terminate this case.

Dated: March 31, 2018.

_____
Neil V. Wake
Senior United States District Judge