**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CMS Mechanical Services, LLC, | No. CV-15-02040-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| PetSmart, Inc., | |
| Defendant. | |

Plaintiff CMS Mechanical Services, LLC ("CMS") brought this breach of contract action against PetSmart, Inc. ("PetSmart"). On March 31, 2018, this Court granted summary judgment in favor of Defendant PetSmart. (Doc. 203.) Now before the Court are Defendant's Motion for Award of Attorneys' Fees and Costs (Doc. 208), the Response, and the Reply. The Court also requested a supplemental affidavit for fees incurred in drafting the Reply. (Doc. 214.) PetSmart submitted the affidavit (Doc. 216), and the deadline for CMS's optional reply has passed.

**I.   BACKGROUND**

The Court described the minutiae of this case in its Summary Judgment Order (Doc. 203). For ease of reference, it restates key details here.

CMS and PetSmart entered into an agreement under which CMS was to provide heating, ventilation, and air-conditioning ("HVAC") services to 1,157 PetSmart store locations. The agreement consisted of two separately executed documents. The first, a Master Agreement, provided general terms that would govern any working relationship

between the parties. The second, a Statement of Work, provided the details of the HVAC servicing arrangement that was to last 60 months—subject to termination "for convenience" by either party with 30 days' notice. Although executed separately, the two documents formed a single contract. That contract clearly and unambiguously listed in an exhibit the service prices for each store down to the penny. The prices in the list totaled roughly $505,000 per month.

CMS contended, contradicting the contract's clear language, that the prices were intended to be estimates. It began to bill PetSmart for all stores using the formula in the Statement of Work that governed potential additional stores. The invoices resulting from this breach of the contract well exceeded $505,000.

Seeking to maintain their relationship, the parties agreed to a capped-billing arrangement. For the remaining months of 2014, the bills were capped at $525,000. CMS sought to raise the billing cap for 2015, and PetSmart agreed to pay $550,000 per month. In 2016, CMS began to bill for over $600,000, claiming the bills represented a return to the proper pricing formula under the contract.

PetSmart exercised its right to terminate. CMS then, for the first time, sent PetSmart an invoice for amounts it had "deferred" under the capped-billing arrangement. The invoice totaled $2.6 million, a figure CMS calculated by applying the additional-stores formula to all stores and subtracting what had already been paid. CMS never identified the deferrals in previous invoices. PetSmart had never previously agreed to pay for any deferrals and refused to pay when presented with the invoice.

CMS filed this lawsuit to collect the $2.6 million. Over a year into the litigation, it claimed to have miscalculated the amount it was owed under the formula. It asserted the correct amount was actually $3.5 million.

Nor was this the only time CMS changed its damages calculation. Shortly before discovery closed, CMS asserted in its third supplemental disclosure an entirely new theory of damages: lost revenues for the remaining duration of the Statement of Work.

CMS calculated its damages under this theory "as not less than $20,654,537.60." (Doc. 93-1, Ex. A at 5.) A flurry of expensive additional discovery ensued. PetSmart had to retain an expert to analyze CMS's internal revenue/profits calculations. CMS continued to move the goal post with respect to how it was calculating the damages, and its sole supporting witness on damages was its CEO. Ultimately, the Court excluded the lost revenue damages theory. (Doc. 143.) As the Court noted, CMS was attempting to effectuate, at the end of discovery, "a profound transformation in the nature of the lawsuit." (Doc. 151 at 54.) The disclosure of the damages theory was untimely and "a serious violation of Rule 26." (*Id.* at 78.) In fact, the Court noted that it was unaware of "anything post-discovery multiplying damages" like CMS's new theory had in this case. (*Id.* at 79.)

PetSmart moved for summary judgment, and the Court found in its favor on all claims. CMS breached the contract in trying to apply the additional-stores formula to all the stores. It offered self-serving extrinsic evidence of the parties' negotiations—evidence barred by the parol evidence rule because it contradicted the only plausible reading of the contract's clear price terms. The parties agreed to billing caps that were fully performed. Despite all evidence demonstrating that PetSmart sought price stability, CMS contended that PetSmart was somehow on the hook for amounts not properly invoiced and far above the contract price. PetSmart did not breach by walking away from this preposterous supposed arrangement and did not owe CMS for its deferred billings.

PetSmart now moves for attorneys' fees and costs under the contract and A.R.S. § 12-341.01.

## II. ANALYSIS

### A. Awarding Attorneys' Fees and Costs Is Mandatory

The parties contracted for mandatory award of fees and all litigation expenses to the prevailing party in litigation. The Master Agreement provides, "In the event either Party brings any action of any nature, arising under or out of this Agreement or Services,

- 3 -

the prevailing Party shall be entitled to receive from the other Party its attorneys', experts', investigation, and other related fees, costs, and expenses." (Doc. 175-1, Ex. 3 at 7.)

PetSmart seeks $1,463,371.63 in fees and $411,956.86 in nontaxable costs. (Doc. 208 at 8, 16). It also seeks $11,082.14 in fees incurred in preparing the Reply on this Motion. (Doc. 213 at 11.) The total is $1,886,410.63.

Some of the nontaxable "costs," such as "Westlaw and Pacer costs in connection with necessary legal research," (Doc. 208 at 17) could be recovered as fees related to the legal work performed. But in the end, the contract unambiguously shifts attorney fees, attorney costs, and all litigation expenses. Sorting precisely between those categories does not matter. The only issue, CMS agrees, is the reasonableness of the amount requested. (Doc. 211 at 1-2.)

### B. What Constitutes Reasonable Attorneys' Fees and Costs

Determining reasonable attorneys' fees in commercial litigation begins with the actual billing rate that the lawyer charged in the particular matter. *Schweiger v. China Doll Rest., Inc.*, 138 Ariz. 183, 187, 673 P.2d 927, 931 (Ct. App. 1983). If persuaded that the contracted hourly rates are unreasonable, courts may use a lesser rate. *Id.* at 188, 673 P.2d at 931.

Under the Arizona Supreme Court's Rules of Professional Conduct, factors to be considered in determining the reasonableness of attorneys' fees include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) the degree of risk assumed by the lawyer.

A.R.S. Sup. Ct. Rules, Rule 42, Rules of Prof. Conduct, ER 1.5. In addition, this Court's Local Rules require consideration of whether the fee contracted between the attorney and the client is fixed or contingent, the "undesirability" of the case, and awards in similar actions. LRCiv 54.2(c).

PetSmart won this lawsuit in every respect. The magnitude of the case justified the large legal expenses; they are entirely reasonable given the circumstances of the case. In particular, CMS's shifting damages theories meant PetSmart faced enormous potential liability—up to $20.7 million if CMS had prevailed on its belated lost revenues theory.

In that light, CMS concedes that PetSmart is entitled to some fees. (Doc. 211 at 1.) But it asks the Court to "reduce the requested award by at least 30%." (*Id.* at 6.) The Local Rules bar this request. *See* LRCiv 54.2(f) ("The responsive memorandum of points and authorities in opposition to a motion for award of attorneys' fees and related non-taxable expenses shall identify with specificity all disputed issues of material fact and shall separately identify each and every disputed time entry or expense item."). The Court will therefore consider only CMS's specific objections.[1]

CMS first argues that it should not be responsible for transition costs (roughly $25,000) when PetSmart switched law firms from Dentons to Bryan Cave. (Doc. 211 at 2-3.) PetSmart sought new counsel when its previous lead counsel left Dentons and the firm "had no other litigation partners in its Phoenix office to handle the representation." (Doc. 213 at 4.) Some duplicative work was therefore necessary and incurred through no fault of PetSmart. It was not a "voluntary change in counsel," as CMS puts it. (Doc. 211 at 3.) Moreover, the fact that both firms billed for transition work does not make it

---

[1] LRCiv 54.2(f) also bars CMS's bald assertion that over "one-third of PetSmart's requested fees" are unreasonable on their face because they were incurred "prior to the close of discovery and before any motion practice had taken place." (Doc. 211 at 4.)

- 5 -

duplicative. That billing was necessary to prevent loss of value. Transition by definition involves work on both sides. CMS fails to point out why any of the specific entries are unreasonable.

Nor is it persuasive simply to point out that both firms worked a large number of hours during the same two-week period. PetSmart notes that the time in question was a busy period in the case. (Doc. 213 at 5.) Indeed, much of the work was directly responsive to CMS's belated and dramatic lost revenues damage theory. CMS again fails to comply with LRCiv 54.2(f).

CMS next complains that there was internally duplicative billing. It offers only one example: five attorneys reviewed the Court's Summary Judgment Order. One of them reviewed it twice, in part to identify appeal issues. (Doc. 211 at 4.) That was not duplicative. Division of labor is efficient and important in a case as large as this one. It was reasonable and necessary to have every attorney who worked on the motion review the Order. Preparing for this Motion, for which the Summary Judgment Order was a necessary predicate, and anticipating possible appeals issues are entirely reasonable tasks, particularly when an appeal from the other side is likely given the scope of the lawsuit. (And indeed, CMS did file an appeal.)

CMS further contends that PetSmart's counsel "consistently overbilled for straightforward work." (*Id*.) First, it says one paralegal billed 3.5 hours reviewing emails between Dentons and CMS's counsel regarding the Second Amended Complaint. (*Id*.) CMS provides no information on those emails, despite its counsel being involved in them, that would allow the Court to find that billing unreasonable. Second, it suggests 1.8 hours was too long to have spent on one joint motion to extend discovery. (*Id*.) Even a cursory review of the motion (Doc. 78) reveals the time spent was reasonable, as it was not a form motion and involved intensive attention to the facts of the case. So too with another joint motion to extend that CMS complains a paralegal spent three hours cite checking. That motion required similarly careful treatment of the particulars of the case

and the Federal Rules of Civil Procedure. (*See* Doc. 95.) Third, CMS complains that one of PetSmart's attorneys spent 0.3 hours reviewing its damages expert's engagement letter. (Doc. 211 at 5 & n.1.) It is reasonable for counsel to spend under 20 minutes reviewing the 12-page engagement letter of its most important expert. (Doc. 213 at 7-8.)

CMS also says it was improper for two paralegals to have billed for time spent locating and ordering complaints and transcripts. (Doc. 211 at 4-5.) The Court agrees that these services did not require specialized legal knowledge or skill. It will therefore reduce the requested award by $265.02. In addition, CMS attaches to its Response "Exhibit C," which it says "provides additional examples of excessive time entries." (*Id.* at 4.) This undeveloped claim fails to meet CMS's burden of persuasion. Nevertheless, the Court reviewed Exhibit C and found only three entries, all related, that were too vague to be reasonable. These involved tracking information sent to an expert. (Doc. 211-1, Ex. C at 18-19 of 66.) The Court will reduce the award by an additional $495.

CMS avers that it was excessive to charge for 110 hours for a motion to compel and 330 hours for a motion to exclude CMS's belated $20.7 million damage theory. (Doc. 211 at 5.) "It is unpersuasive to argue that too many hours were spent conducting research for and drafting a particular motion without any context (*e.g.*, number and complexity of factual and legal issues) by which to assess whether the number of hours is excessive." *11333, Inc. v. Certain Underwriters at Lloyd's, London*, No. CV-14-02001-PHX-NVW, 2018 WL 1570236, at *7 (D. Ariz. Mar. 30, 2018). The circumstances surrounding the assailed motions—both of which involved lengthy descriptions of facts and law and dealt with CMS's belated and potentially ruinous lost revenues damage claim—make the hours and expenses reasonable. (*See generally* Doc. 151 (hearing on second motion during which both parties describe the bases for both motions).) The hours and fees on these critical motions were entirely justified and reasonable.

Finally, CMS takes issue with some of PetSmart's claimed nontaxable costs.[2] First, CMS challenges a charge to process ESI data held by Dentons, again incorrectly referring to the "voluntary transition of the case to a new firm." (Doc. 211 at 6.) PetSmart says the cost was a necessary consequence of the firm change (Doc. 213 at 10), and all of those expenses where reasonable and necessary. Second, CMS takes issue with some of PetSmart's counsel's travel expenses. (Doc. 211 at 6.) CMS canceled an out-of-town deposition, and PetSmart's counsel incurred about $300 in nonrefundable travel expenses as a result. CMS objects that it should not have to pay for an unused nonrefundable air travel ticket. Yet CMS also objects that PetSmart's counsel booked a more expensive, refundable ticket for the just-rescheduled deposition during the holiday season. Both those expenses were reasonable and necessary.

Third, and most importantly, CMS seeks to avoid paying the roughly $300,000 in expert witness fees for PetSmart's damages expert. The expert did what financial experts do, which required analyzing CMS's shifting claims that escalated the potential liability in this case to $20.7 million. The expense is completely reasonable and absolutely necessary in light of CMS's improper attempt to multiply its damage claim on the eve of the close of discovery. CMS fails to carry its burden to demonstrate otherwise.

In sum, PetSmart will be awarded $1,885,650.61, which represents the $1,886,410.63 in requested fees and costs less the $760.02 ($265.02 + $495) discussed above.

IT IS THEREFORE ORDERED that Defendant's Motion for Award of Attorneys' Fees and Costs (Doc. 208) is granted in the amount of $1,885,650.61.

---

[2] CMS asserts that a "30% reduction in the overall costs is warranted to account for the inappropriate and duplicative expenses included in PetSmart's request for costs." For the reasons given, this claim violates LRCiv 54.2(f) and is rejected. The Court considers only CMS's specific objections. In any event, a reduction is not warranted.

IT IS FURTHER ORDERED that the Clerk to enter judgment in favor of Defendant PetSmart, Inc., against Plaintiff CMS Mechanical Services, LLC, in the amount of $1,885,650.61, plus interest thereon at the federal rate of 2.31% per annum from the date of judgment until paid.

Dated this 31st day of May, 2018.

_Neil V. Wake_
Neil V. Wake
Senior United States District Judge